Emmanuel Coffy (047132004)
emmanuel.coffy@coffylaw.com
Beth H. Meyer *Of Counsel*
COFFYLAW, LLC
515 Valley Street, Annex Bldg., Ste 1
Maplewood, New Jersey 07040
Telephone: (973) 996-2947
Facsimile:  (973) 996-2952
*Attorneys for Plaintiff*
*iPurusa, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| iPURUSA, LLC | Civil Action No. |
| *Plaintiff* | |
| v. | **COMPLAINT**<br>**JURY TRIAL DEMANDED** |
| BNY MELLON, Q2 STRATEGIES<br>DATA BLUE, LLC, AHEAD, JOHN DOE 1-5<br>MARY DOE 1-5 and/or ABC 1-5 and/or DOE<br>CORPORATION 1-5, (fictitious name), DOE SNOW<br>CORPORATION 1-5, | |
| *Defendants.* | |

iPURUSA, LLC ("iPurusa" or "Plaintiff"), by and through its undersigned Attorneys, alleges as follows:

## I.  NATURE OF THE ACTION

1.     This is a civil action for copyright infringement of a federally registered copyright in violation of the Copyright Act of 1976, 17 U. S. C. §§ 101 *et seq.* (the "Copyright Act"), individually and collectively by  Defendants  hereinafter ("Defendants" or "Defendant"). Plaintiff seeks injunctive relief, statutory damages, attorney fees and costs, and such other relief as the court deems proper.

## II. JURISDICTION AND VENUE

2.      This is an action arising under the Copyright Act, 17 U.S.C. § 501.

3.      This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), and §1332(a) (complete diversity of the parties, and the amount in controversy exceeds $75,000.00), §2201 (declaratory relief), §2202 (further relief), §1338(a) as an action arising out of violations of the Copyright Act, as amended, 17 U.S.C. §§ 101 et seq.

4.      Defendant BNY Mellon is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or New Jersey Long Arm Statute due at least to its substantial business in this State and judicial district including regularly doing or soliciting business in the State of New Jersey and thereby deriving substantial revenue from goods and/or services provided to New Jersey residents.

5.      Defendants Q2 Strategies, Data Blue, LLC and AHEAD are subject to the personal jurisdiction of this Court under the doctrine of diversity of citizenship pursuant to 28 U.S.C. §1332.

6.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1391(b) (general venue provision) and 28 U.S.C. §§ 1400(a) because, upon information and belief, Defendants reside in this judicial district and a substantial part of the event mentions or omissions giving rise to the claims asserted in this action occurred in this district, causing damage to Plaintiff in this district.

## III.    THE PARTIES

7.      iPurusa LLC ("Plaintiff") is a limited liability company organized and existing under the laws of the State of New Jersey, with principal place of business located in South River, New Jersey.  See Exhibit A.

8.      Upon information and belief, the Bank of New York Mellon Corporation is a Delaware corporation with its principal place business in New York, New York. This defendant may

be served with process through its registered agent, the Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

9.      This defendant does business in the State of New Jersey. BNY is an international banking conglomerate with offices in twenty-eight (28) states including the State of New Jersey including trust offices doing business under other names and branches. In September 2021, the BNY website expressly features the Rifle Camp Road, Woodland Park, Passaic County office and/or branch specially as BNY Mellon. The yellow pages list offices and/or branches in Woodcliff Lakes, Jersey City and multiple locations.

10.     Upon information and belief, Defendant Q2 Strategies, LLC is a limited liability company organized and existing under the laws of the State of Michigan, with principal place of business located in Brighton, Michigan.

11.     Upon information and belief, Defendant Datablue, LLC is a limited liability company organized and existing under the laws of the State of Georgia, with principal place of business located in Atlanta, Georgia.

12.     Upon information and belief, Defendant AHEAD is the parent company of Datablue, LLC. AHEAD is a limited liability company organized and existing under the laws of the State of Illinois, with principal place of business located in Chicago, Illinois.

## IV.    FACTS COMMON TO ALL CLAIMS

13.     Plaintiff is a limited liability company specializing in software design.

14.     Defendant BNY Mellon is an international banking conglomerate with offices in twenty-eight (28) states including the State of New Jersey including trust offices doing business under other names and branches.

15.     Defendant Q2 Strategies is a national provider of management consulting and technology solutions (services and products) focused on connecting business, technology and talent

strategies. Q2 works with its clients to align these strategies to better ensure operational success and competitive advantage in the marketplace.

16.    Defendant Data Blue is implicated in business transformation solutions, redefines the Value-Added Reseller space by offering both the customer and manufacturer something that's a step above what is currently available in the marketplace.

17.    Defendant AHEAD is an enterprise cloud infrastructure provider creating cloud-native applications and providing modern data-driven solutions. AHEAD offers comprehensive Managed Services from full program management of the entire IT infrastructure or security management only, depending on the specific need.

18.    Plaintiff is the copyright owner of an original work known as Moksha Automation Suite (the "Work").  The Work is an original copyrightable software system entitled: " System to visually create, validate, modify, execute and report on automated software scripts in any markup language for performing any type of computer-related task (such as file system, registry, memory, hardware, etc.) which are executed by a rules-based engine that visually creates, logically interprets and executes all actions as defined in the scripts."

19.    Further, an application for service mark for the phrase "Moksha Automation Suite" was filed at the United States Patent & Trademark Office (USPTO) on March 6, 2021. The trademark is scheduled to publish for opposition in the Official Gazette on Mar 1, 2022. See Exhibit B.

20.    Plaintiff has complied in all respects with 17 U.S.C. § 101 et seq. and has secured exclusive rights in the Work and has received its copyright registration in the Work with the Copyright Office in accordance with its rules and regulations. See Exhibit C.

21.    Throughout a four-year time period during 2012–2015 Shankar implemented, designed, developed the software application denominated "Moksha," often devoting fifteen-hour days of his own time while unemployed, to its creation. He was not employed during some of this time, specifically for nine (9) months between 2012–2014.

22.    Shankar was educated at New York receiving his Associate's in Business degree from New York University, and at New Jersey receiving his Bachelor's in Philosophy degree from Rutgers University, respectively.

23.    Shankar also studied Computer Engineering and Software Development at Control Data Institute in New York. Shankar has worked as a Computer Software Engineer since May 1990.  In 2012-2015, Shankar worked as an independent contractor for Morgan Stanley company from 2010-2012, and as an independent contractor for AIG company from 2012-2013, and as an independent contractor for Bank of America company from 2013-2013, and as an independent contractor for AIG company from 2013-2014, and an independent contractor for Royal Bank of Canada company from 2014-2016.  He was never authorized, required or assigned to design or create Moksha or computer programs like Moksha, which he designed and created on his own time exclusively.

24.    Shankar obtained his skills in Computer Engineering through learning five (5) computer languages at Control Data Institute and thirty-one (31) years of work experience.

25.    M. Casey obtained her skills in Execute Administration through thirty (30) years of work experience.

26.    M. Casey was educated at New York receiving her diploma from the Academy for Career Education, at Cornell University receiving credit for one and half years of studies, and at New York receiving her Associates degree from New York University, respectively.

27.    M. Casey supervised a team at American Express from 1997 to 2003.

28.    M. Casey has worked as an Executive Assistant since 1992.

29.    iPurusa LLC was formed as an LLC on January 12, 2017 by M. Casey Rampersaud as its Managing Member/President.

30.    iPurusa is a small business with profits under $250,000 since its formation. It employs M. Casey who functions as Managing Member/President and Creative Director and has had no independent contractors.

31.  Shankar's role at iPurusa was and is Software Architect and M. Casey's role at iPurusa was and is Managing Member/President and Creative Director.

32.  iPurusa is and was a dream of M. Casey and Shankar from January 2012 until its formation out of their joint vision of creating a software platform and framework that visually creates configuration management workflows that automates 95% of manual tasks.

33.  M. Casey contributed to Moksha's creation during years 2012-2015 and to its evolution on or about 2016. M. Casey's role as Creative Director was to jointly develop the user interface to ensure simplicity of use and logic flow. Moksha's creation resulted from close collaboration of Shankar and M. Casey.

34.  Moksha was and is completely and totally the original authorship of Shankar and M. Casey for iPurusa and is not based upon or derived from any prior software or application or any part thereof. Moksha's purpose was and is for creating a software platform and framework that visually creates configuration management workflows that automates 95% of manual tasks and enable its end-users to rapidly and visually create an automated application without typing a line of code. The initial 2012-2014 development and design of Moksha took place in New Jersey at Shankar's South River, New Jersey office

35.  Moksha was enhanced by Shankar on March 2017 to enable its users to gain access to more user management features. Its end-users were to be assignees such as iPurusa and entities like BNY Mellon whose access was to be limited by the control and custody of iPurusa on a per project basis. Such limited-use license is evident in the End-User License Agreement embedded in Moksha, to wit: "iPurusa, LLC grants you a revocable, non-exclusive, non-transferable, limited license to download, install and use the Application solely for your personal, non-commercial purposes strictly in accordance with the terms of this Agreement."

36.  Having conceived and created Moksha,  M. Casey Rampersaud applied for a patent at the United States Patent & Trademark Office (USPTO) on September 9, 2014. The application was assigned U.S. Patent Application Number 14/481,246.  See Exhibit D.

**A.    MOKSHA APPLICATION:**

37.    Moksha is a computer software application whose main function is to create a software platform and framework that visually creates configuration management workflows that automates 95% of manual tasks.

37.    Moksha was created on the PCs and laptops owned and operated by iPurusa in South River, NJ and revised during 2017-2018 on the PCs and laptops owned and operated by iPurusa in South River, New Jersey.

38.    The Moksha computer program, without disclosing or revealing any trade secret or proprietary information, may be viewed in these six declining abstraction levels (Gates):

(i)  Its main purpose or function may be described as follows to understand what this program is intended to do:

   a.  Moksha Automation Suite (Moksha) is a DevOps, No-Code, Workflow Orchestration and Automation Rules Creation/Execution Engine.

(ii) The program structure or architecture i.e., how the program operates in terms of its various functions, which are performed by discrete modules which interact together, may be described as follows:

   a.  Moksha enables graphical execution of Tasks and Business Rules against one or more entities - users, devices, objects. Moksha logically handles Expected Results, Successes and Failures; enables Exceptions, branching based on Success/Failure, Success/Failure Messages and Child Task executions based on Primary Tasks Success/Failure. Moksha diagnoses, analyzes, reports and configures an enterprise environment. Moksha executes a series of automated tasks that collectively constitutes configuration management workflows, visually created within Moksha, which sole purpose is to automate 95% of manual tasks.

(iii)  The primary distributable modules are Moksha Automation Suite Agent, Moksha Automation Suite Client, Moksha Automation Suite Service and Moksha Automation Suite Designer and identify a particular result or set of actions that may be performed, and 'data types,' which define the type of item that an operator , Shankar, acts upon, by doing and engaging system-level functions of BNY Mellon, Data Blue and/or Q2.

(iv) The Moksha algorithms, its specific manifestations of operations and series of steps that accomplish a particular operation and data structures ['precise representation[s] or specification[s] of...data type[s] that [consist] of (i) basic data type groupings like integers or characters, (ii) values, (iii) variables, (iv) arrays or groupings of the same data type, v) records or groupings of different date types, and (vi) pointers or connections between records that set aside space to hold the record's values'] were developed by Shankar, derived from no existing application, and designed by him in order to facilitate the rapid, visual creation of automated tasks. They were applied to BNY Mellon's global computers, servers and networks by BNY Mellon Mellon's software installation/deployment team in the United Kingdom in order to provide various automated applications for every user in every department.

(v) Moksha's source code ['the literal text of a program's instructions written in a particular programming language'] was written using a combination of Microsoft's Visual Basic.NET and Microsoft's C#.NET languages by Shankar.

(vi) Moksha's object code ['the literal text of a computer program written in a binary language through which the computer directly receives its instructions'] was compiled and maintained by Shankar.

## B.    MOKSHA IMPLEMENTATION HISTORY:

39.    On or about December 6, 2016, Moksha was first demonstrated to Andrew Sweeney at Eden Technologies, and subsequently installed on a server at Eden Technologies and used and tested as an external application to be integrated into Eden Technologies software "EMMA." This joint venture between iPurusa and Eden Technologies did not come to fruition and Moksha was removed from the server at Eden Technologies.

40.    On or about April 28, 2017, Denis L'Huiller first contact with Shankar occurred in New Jersey concerning BNY Mellon assignment to work on a project as an independent contractor doing Engineering work. The manner of their contact was via phone and email. Shankar learned of Denis L'Huiller via an email introduction.

41.    On or about May 1, 2017, on behalf of iPurusa, Shankar entered into a contract to work as an independent contractor with Data Blue. Shankar negotiated the contract from his South River, New Jersey, office.

42.    On or about May 1, 2017, M. Casey entered into a contract to provide work as an independent contractor with Data Blue.

43.    On or about May 1, 2017, on behalf of iPurusa, M. Casey first had contact with Denis L'Huiller as a result of signing the contract. M. Casey learned of Denis L'Huiller via an email introduction.

44.    On or about May 1, 2017, iPurusa and Data Blue entered into a signed contract with iPurusa as an independent contractor of Data Blue providing engineering services to BNY Mellon. Shankar was assigned the task to service BNY Mellon account. Throughout the duration of iPurusa's respective contract with Data Blue from May 2017 through December 2018, iPurusa had and maintained exclusive ownership of Moksha. Its ownership rights never were sold, shared, licensed, commissioned and/or assigned and were exercised only by its principal and owner M. Casey Rampersaud.

45.    As a Data Blue independent contractor, Shankar's various duties as a Senior Technical Engineer were to assist in managing the virtual device infrastructure, which were performed for BNY Mellon on BNY Mellon PC/laptop owned by BNY Mellon and operated by BNY Mellon. These duties were explained to Shankar by Mark Szpakowski who is a Managing Director at BNY Mellon. Shankar was supervised by Mark Szpakowski who reported to Andrew Stokes.

46.    Shankar had and maintained exclusive care, custody and control over Moksha throughout the iPurusa contract with Data Blue. Shankar's practice was to contact BNY Mellon's UK employees who would install Moksha on all 65,000+ computers at BNY Mellon.

47.    On or about January 1, 2019, iPurusa and Q2 Strategies entered into a verbal agreement with iPurusa as an independent contractor of Q2 Strategies providing Engineering services to BNY Mellon. Again, Shankar was assigned the task to service the BNY Mellon account

and concurrently Q2 Strategies hired Shankar as an employee of Q2 Strategies providing engineering services to BNY Mellon.

48. As a Q2 Strategies independent contractor, Shankar's various duties as a Senior Technical Engineer were to assist in managing the virtual device infrastructure, which were performed for BNY Mellon on BNY Mellon PC/laptop owned by BNY Mellon and operated by BNY Mellon. These duties were explained to Shankar by Mark Szpakowski, a Managing Director at BNY Mellon. Shankar was supervised by Mark Szpakowski who reported to Andrew Stokes.

49. As a Q2 Strategies employee, Shankar's various duties as a Senior Technical Engineer were to assist in managing the virtual device infrastructure which were performed for BNY Mellon on BNY Mellon PC/laptop owned by BNY Mellon and operated by BNY Mellon. These duties were explained to Shankar by Mark Szpakowski, a Managing Director at BNY Mellon. Shankar was supervised by Mark Szpakowski who reported to Andrew Stokes.

50. Shankar had and maintained exclusive care custody and control over Moksha throughout the term of the iPurusa contract with Q2 Strategies and Shankar's employment at Q2 Strategies as an employee. Shankar's practice was to contact BNY Mellon's UK employees who would install Moksha on all 65,000+ computers at BNY Mellon.

51. All of iPurusa's contacts with the parties occurred from its South River, New Jersey office.

52. All of the extensive efforts to develop and redevelop Moksha occurred from iPurusa's South River, New Jersey office.

53. On January 1, 2019, Shankar entered into a verbal agreement on behalf of iPurusa with Q2 Strategies and he was assigned to start work on January 1, 2019, at BNY Mellon's New Jersey office located at 95 Christopher Columbus Drive, Jersey City, New Jersey. He worked at the New Jersey office during May 2017 through March 2021 with most of the work done remotely from his South River, NJ office. Shankar had no written contract with Q2 Strategies which hired him as its employee from January 2019 to perform Engineering

services for BNY Mellon from January 2019 to March 2021 and as an independent contractor to perform Engineering services for BNY Mellon from January 2019 to March 2021.

54. On or about January 10, 2019, Shankar had his last contact with Denis L'Huiller the nature of which was to verify invoice payment to iPurusa.

55. On January 10, 2019, on behalf of iPurusa Plaintiff M. Casey had her last contact with Denis L'Huiller the nature of which was to verify invoice payment to iPurusa.

56. Upon information and belief, BNY Mellon is providing access to the Moksha despite having no permission to do so.

57. By providing unauthorized access to Moksha, Defendant is engaging in copyright infringement.

58. Upon information and belief, Defendant has infringed and is infringing the copyright in the "Work" by unlawfully reproducing and distributing identical copies of the Work, in violation of the United States Copyright Act, 17 U.S.C. §§ 106 et seq.

## C.    BREACHES & INFRINGEMENT:

### BNY Mellon:

59. BNY Mellon copied and/or obtained access to Moksha in 2017 when Moksha was installed on its servers to provide automation services. BNY Mellon approved, sanctioned and allowed testing and deployment of Moksha from its UK offices by Mark Szpakowski. Upon information and belief, nine (9) employees/contractors at BNY Mellon's US and UK offices were involved.

60. BNY Mellon copied and/or obtained access to Moksha in 2018 when Moksha was installed on its servers and most of its computers to provide automation services. Kelly Walsingham, on behalf of BNY Mellon, accepted, tested and used Moksha from all of its offices by. Upon information and belief, nine (9) employees/contractors at its US and UK offices were involved.

61.    BNY Mellon copied and/or obtained access to Moksha in 2019 when Moksha was installed on its servers and most of its computers to provide automation services. Dave Donley on behalf of BNY Mellon accepted, tested and used Moksha from all of its offices. Upon information and belief, twelve (12) employees/contractors at its US and UK offices were involved.

62.    BNY Mellon copied and/or obtained access to Moksha in 2020 when Moksha was installed on its servers and most of its computers to provide automation services. Michael Wood on behalf of BNY Mellon accepted, tested and used Moksha from all of its offices by. Upon information and belief, eighteen (18) employees/contractors at all of its offices globally were involved.

63.    BNY Mellon copied and/or obtained access to Moksha in 2021 when Moksha was installed on its servers and most of its computers to provide automation services. Michael Wood and Mark Szpakowski on behalf of BNY Mellon accepted, tested and used Moksha from all of its offices. Upon information and belief, eighteen (18) employees/contractors at all of its offices globally were involved.

64.    All of BNY Mellon's aforesaid actions of copying and accessing Moksha were without the permission, authority, agreement, acquiescence and/or approval of Shankar, M. Casey and/or iPurusa. BNY Mellon's actions were in violation of established software copyright laws and contrary to the notice in Moksha's End-User License Agreement. They continue through this day despite receipt of iPurusa's Cease and Desist letter dated March 2, 2021, which BNY Mellon has rejected.  See Exhibit D.

**D.    IN CONCERT**:

65.    Upon information and belief, BNY Mellon acted in concert with Q2 Strategies and Data Blue each of whom knew of BNY Mellon and either acted in support and expressly assented to BNY Mellon's misdeeds or tacitly approved of it by inaction in failing to object to and oppose the BNY Mellon misdeeds and/or to notify Shankar, M. Casey and/or iPurusa in a timely manner so they may intervene and stop BNY Mellon.

66.    Q2 Strategies and/or Data Blue also acted in concert with BNY Mellon in that: (a) Q2 Strategies did know of the infringement by BNY Mellon and continues to tacitly support it and failed and still fails to take any action against BNY Mellon; and (b) Data Blue did know of the infringement by BNY Mellon and continues to tacitly support it and failed and still fails to take any action against BNY Mellon.

**E.    NOTICE OF BREACHES & INFRINGEMENT:**

67.    On February 19, 2020, possible infringement by BNY Mellon was first learned from Michael Wood and Mark Szpakowski via email about misappropriating the Moksha software installed by Shankar/iPurusa when he emailed both Michael Wood and Mark Szpakowski of the combined total amount of money saved by BNY Mellon, to wit $5.87 million, during the two (2) years of his project at BNY Mellon pursuant to the terms of the agreement with Q2. See Exhibit E.

68.    On February 24, 2020, first learned from Michael Wood and Mark Szpakowski via phone of a possible infringement by BNY Mellon misappropriating the Moksha software installed by Shankar/iPurusa when he emailed both Michael Wood and Mark Szpakowski that Moksha is a copyrighted software of iPurusa, and needed to be purchased by BNY Mellon for continued use, during the two years of his project at BNY Mellon pursuant to the terms of the agreement with Q2.

69.    On or about March 31, 2020, possible infringement was first learned from BNY Mellon Help Desk via email of a possible infringement by BNY Mellon misappropriating the Moksha software installed by Shankar/iPurusa when a popup message appeared on every user's computer stated that "Moksha Automation Suite by iPurusa LLC is operating under an expired license, therefore the application will now exit" during the two years of his project at BNY Mellon pursuant to the terms of the agreement with Q2.

70.    On April 6, 2020, possible infringement first learned from Mark Szpakowski via phone of a possible infringement by BNY Mellon misappropriating the Moksha software installed by Shankar/iPurusa when Mark indicated he may not have funds to continue

Shankar's contract, and Shankar indicated that if he was fired, he would have to uninstall Moksha globally since it is iPurusa's property, during the two years of his project at BNY Mellon pursuant to the terms of the agreement with Q2.

71.    On May 6, 2020, possible infringement first learned from Mark Szpakowski via phone of a possible infringement by BNY Mellon misappropriating the Moksha software installed by Shankar/iPurusa when Mark Szpakowski agreed to approach CDW or Data Blue to discuss purchasing the intellectual property for Moksha from iPurusa during the two years of his project at BNY Mellon pursuant to the terms of the agreement with Q2.

72.    On or about June 1, 2020, possible infringement first learned from Michael Wood via phone of a possible infringement by BNY Mellon misappropriating the Moksha software installed by Shankar/iPurusa when Michael Wood said he had no authority to purchase Moksha, only Mark Szpakowski had that authority, during the two (2) years of his project at BNY Mellon pursuant to the terms of the agreement with Q2.

73.    On or about March 3, 2021, first learned via phone from Michael Delsordo of Q2 Strategies of a possible infringement by BNY Mellon misappropriating, stealing and using without license, assignment, commission or any other form of permission, the Moksha software installed and controlled by Shankar/iPurusa during its two year project at BNY Mellon pursuant to the terms of its respective written contract with Data Blue (May 1 2017  - December 31, 2018) and verbal agreement with Q2 Strategies (January 1 2019 – March 3 2021).

74.    On March 3, 2021, iPurusa's agreement with Q2 Strategies for the BNY Mellon project was terminated by BNY Mellon as Shankar was advised by Q2.

75.    Shankar and iPurusa were locked out of the Moksha software by BNY Mellon which block has stayed in effect since March 3, 2021 despite efforts to recover the software.

76.    Upon information and belief, BNY Mellon's infringement and misappropriation of Moksha first occurred in New Jersey and ongoingly continues to occur on all 95,000+ computers in all of its thirty-five (35) global offices.

77.    Any BNY Mellon infringement and misappropriation of Moksha outside of the US resulted from its initial and ongoing misconduct in the US, specifically in New Jersey.

78.    The natural and probable foreseeable result of Defendant's wrongful conduct has been to deprive Plaintiff of the benefits of selling products embodying the Work and licensing others to sell products embodying the Work, and to injure Plaintiff's relationship with present and prospective customers.

79.    Defendant's production and sale of the infringing products and Defendant's wrongful conduct has also deprived and continues to deprive Plaintiff of the opportunity of expanding its good will.

80.    Defendant's infringements were and are willful, in bad faith, and executed with full knowledge of Plaintiff's copyright, and in conscious disregard for Plaintiff's exclusive rights in the protected Work.

81.    Defendant's deliberate infringement of Plaintiff's copyright has greatly and irreparably damaged Plaintiff, and Defendant will continue to damage Plaintiff greatly and irreparably unless enjoined by this Court. In the absence of injunctive relief, Plaintiff will have no adequate remedy at law. Accordingly, Plaintiff is entitled to a temporary and permanent injunction in accordance with 17 U.S.C. § 502.

<u>**COUNT ONE**</u>

**Copyright Infringement – 17 U.S.C. § 101 et seq.**

82.    Plaintiff realleges and incorporates by reference the allegations of paragraphs **Error! Reference source not found.** through 82 as if fully set forth herein.

83.    Plaintiff owns valid copyrights in the Work at issue in this case.

84.    Plaintiff registered the Work with the Register of Copyrights pursuant to 17 US.C. § 411(a). A true and correct copy of the Certificate of Registration from the U.S. Copyright Office is attached as Exhibit C hereto.

85.    Plaintiff is currently and at all relevant times has been the sole proprietor of all rights, title and interest in and to the copyrights of the Work.

86.    The Work is a wholly original work that is copyrightable subject matter under the laws of the United States.

87.    At no time has Plaintiff authorized Defendant to reproduce, distribute, prepare derivative works, or publicly display the Work or any portion thereof.

88.    Defendant is willfully infringing Plaintiff's copyright in the Work by reproducing, displaying, distributing, and creating derivative works of the Work without permission in violation of the Copyright Act, 17 U.S.C. § 106.

89.    The infringement was willful, executed with full knowledge of Plaintiff's copyright, and in conscious disregard of Plaintiff's exclusive rights in its protected Work.

90.    By reason of the infringement, Plaintiff has sustained and will continue to sustain substantial injury, loss, and damage to its ownership rights in the copyrighted Work.

91.    Because Plaintiff is without an adequate remedy at law, Plaintiff is entitled to an injunction, in accordance with 17 U.S.C. § 502, restraining Defendant, its officers, directors, agents, employees, representatives, assigns, and all persons acting in concert with Defendant from engaging in further acts of copyright infringement.

92.    Plaintiff is further entitled to recover from Defendant the gains, profits, and advantages Defendant has obtained as a result of copyright infringement.

93.    At its election, Plaintiff is entitled to recover statutory damages in accordance with 17 U.S.C. § 504.

94.    Plaintiff is also entitled to recover costs and attorneys' fees in accordance with 17 U.S.C. § 505.

95.   Plaintiff is informed and believes, and on that basis alleges, that unless enjoined by this
      Court, Defendant will continue its course of conduct and will continue to wrongfully use,
      infringe upon, sell, and otherwise profit from Plaintiff's copyrighted Work.

## COUNT TWO

### Software Piracy – 17 U.S.C. § 506

96.   Plaintiff realleges and incorporates by reference the allegations of paragraphs **Error!
      Reference source not found.** through 95 as if fully set forth herein.

97.   Defendant is illegally using, copying or distributing Moksha without ownership or legal
      rights.

98.   On or about March 31, 2020, possible infringement was first learned from BNY Mellon
      Help Desk via email of a possible infringement by BNY Mellon misappropriating the
      Moksha software installed by Shankar/iPurusa when a popup message appeared on every
      user's computer stated that "Moksha Automation Suite by iPurusa LLC is operating
      under an expired license, therefore the application will now exit" during the two years of
      his project at BNY Mellon pursuant to the terms of the agreement with Q2.

99.   By reason of the infringement, Plaintiff has sustained and will continue to sustain
      substantial injury, loss, and damage to its ownership rights in the copyrighted Work.

100.  Because Plaintiff is without an adequate remedy at law, Plaintiff is entitled to an
      injunction, in accordance with 17 U.S.C. § 502, restraining Defendant, its officers,
      directors, agents, employees, representatives, assigns, and all persons acting in concert
      with Defendant from engaging in further acts of copyright infringement.

101.  Plaintiff is further entitled to recover from Defendant the gains, profits, and advantages
      Defendant has obtained as a result of copyright infringement.

102.  At its election, Plaintiff is entitled to recover statutory damages in accordance with 17
      U.S.C. § 504.

103.    Plaintiff is also entitled to recover costs and attorneys' fees in accordance with 17 U.S.C. § 505.

104.    Plaintiff is informed and believes, and on that basis alleges, that unless enjoined by this Court, Defendant will continue its course of conduct and will continue to wrongfully use, infringe upon, sell, and otherwise profit from Plaintiff's copyrighted Work.

## COUNT THREE

### Quantum Meruit

105.    Plaintiff  incorporates by reference the allegations of paragraphs **Error! Reference source not found.** through 104 as if more fully set forth herein.

106.    BNY Mellon copied and/or obtained access to Moksha in 2017 when Moksha was installed on its servers to provide automation services. Mark Szpakowski on behalf of BNY Mellon approved, sanctioned and allowed testing and deployment of Moksha from its UK offices. Upon information and belief, nine (9) employees/contractors at BNY Mellon's US and UK offices were involved.

107.    BNY Mellon copied and/or obtained access to Moksha in 2018 when Moksha was installed on its servers and most of its computers to provide automation services. Kelly Walsingham on behalf of BNY Mellon accepted, tested and used Moksha from all of its offices. Upon information and belief, nine (9) employees/contractors at its US and UK offices were involved.

108.    BNY Mellon copied and/or obtained access to Moksha in 2019 when Moksha was installed on its servers and most of its computers to provide automation services. Dave Donley on behalf BNY Mellon accepted, tested and used Moksha from all of its offices. Upon information and belief, twelve (12) employees/contractors at its US and UK offices were involved.

109.    BNY Mellon copied and/or obtained access to Moksha in 2020 when Moksha was installed on its servers and most of its computers to provide automation services. Michael Wood on behalf BNY Mellon accepted, tested and used Moksha from all of its offices.

Upon information and belief, eighteen (18) employees/contractors at all of its offices globally were involved.

110. BNY Mellon copied and/or obtained access to Moksha in 2021 when Moksha was installed on its servers and most of its computers to provide automation services. Michael Wood and Mark Szpakowski on behalf of BNY Mellon accepted, tested and used Moksha from all of its offices. Upon information and belief, eighteen (18) employees/contractors at all of its offices globally were involved.

111. All of BNY Mellon's aforesaid actions of copying and accessing Moksha were without the permission, authority, agreement, acquiescence and/or approval of Shankar, M. Casey and/or iPurusa. BNY Mellon's actions were in violation of established software copyright laws and contrary to the notice in Moksha's End-User License Agreement. They continue through this day despite receipt of iPurusa's Cease and Desist letter dated March 2, 2021, which BNY Mellon has rejected.

112. At all the times when the Services were being performed, the Defendant was aware that Plaintiff was performing the Services. At no time did the Defendant ever direct Plaintiff to stop performing the Services or advise Plaintiff that the Services were no longer wanted or needed. The Defendant accepted, received, and enjoyed the Services provided by Plaintiff.

113. The fair and reasonable value of the services Plaintiff provided to Defendant shall be determined at trial.

114. Plaintiff demanded payment from Defendant Q2 Strategies for the Services.

115. Defendant has failed and refused to pay Plaintiff for any part of the reasonable value of the Services. As a result of such failure to pay for the Services, Defendant is indebted to Plaintiff in the sum of at least $10,000,000.00 which amount represents the fair and reasonable value of Plaintiff's Services.

## COUNT FOUR

**Tortious Interference With Business Relations
And Prospective Economic Advantage**

116.    Plaintiff repeats, re-alleges and incorporates by reference the foregoing paragraphs as though the same were fully set forth at length herein.

117.    Defendants are without excuse or justification but for the intent to harm Plaintiff.

118.    Defendants' conduct was actuated by actual malice or accompanied by wanton and willful disregard to Plaintiff's rights.

119.    As a result of Defendants' conduct, Plaintiff's income is reduced thereby depriving Plaintiff of a reasonable profit from Plaintiff's investment.  Therefore, Plaintiff's economic advantage has been tortuously interfered with.

120.    As a direct and proximate result of Defendants' conduct as aforesaid, Plaintiff is injured.

121.    Plaintiff's damages from the aforesaid unlawful actions of Defendants, to the extent ascertainable, have not yet been determined.

## COUNT FIVE

**Civil Conspiracy**

122.    Plaintiff repeats, re-alleges and incorporates by reference, the foregoing paragraphs as though the same were fully set forth at length herein.

123.    Defendants acted in concert to illegally use Moksha Automation Suite, thereby infringing Plaintiff's copyrights among other violations.

124.    Defendants' conduct was actuated by actual malice or accompanied by wanton and willful disregard to Plaintiff's rights.

125.    As a result of Defendants' conduct Plaintiff's income is reduced thereby depriving Plaintiff of a reasonable profit from Plaintiff's investment.  Therefore, Plaintiff's economic advantage has been tortuously interfered with.

126.    As a direct and proximate result of Defendants' conduct as aforesaid, Plaintiff is injured.

127.    Plaintiff's damages from the aforesaid unlawful actions of Defendants, to the extent ascertainable, have not yet been determined.

## COUNT SIX

### Prima Facie Tort

128.    Plaintiff repeats, re-alleges and incorporates by reference the foregoing paragraphs as though the same were fully set forth at length herein.

129.    Defendants are without excuse or justification but for the intent to harm Plaintiff.

130.    Defendants' actions have resulted in special damages.

131.    Defendants' conduct was actuated by actual malice or accompanied by wanton and willful disregard to Plaintiff's rights.

132.    As a direct and proximate result of Defendants' conduct as aforesaid, Plaintiff is injured.

133.    Plaintiff's damages from the aforesaid unlawful actions of Defendants, to the extent ascertainable, have not yet been determined.

## COUNT SEVEN

### Unjust Enrichment

134.    Plaintiff repeats, re-alleges and incorporates by reference the foregoing paragraphs as though the same were fully set forth at length herein.

135.    This cause of action arises under the common law.

136.    By the acts and activities of Defendants complained of herein, Defendants have been unjustly enriched.

137.    Defendants' conduct described above has caused and, if not enjoined, will continue to cause irreparable damage to the rights of Plaintiff in its software, its business, reputation, and good will.

138.    On information and belief, Defendants will continue to infringe Plaintiff's valuable right in its software to the detriment of Plaintiff unless restrained by this Court.

139.    Plaintiff has suffered and is continuing to suffer irreparable injury for which there is no adequate remedy at law.

140.    Plaintiff's damages from the aforesaid unlawful actions of Defendants, to the extent ascertainable, have not yet been determined.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant as follows:

A.    For a preliminary and permanent injunction enjoining and restraining Defendant and all persons acting in concert with Defendant from reproducing, distributing, creating derivative works, displaying, advertising, promoting, offering for sale and/or selling, or performing any materials that are substantially similar to the copyrighted Work, and to destroy and certify to the Court such destruction or deliver to the Court for destruction or other reasonable disposition all such materials and means for producing same in Defendant's possession or control;

B.    For a preliminary and permanent injunction enjoining and restraining Defendant and its agents, servants, employees, attorneys, and all persons acting in concert and participation with it from infringing upon Plaintiff's copyrights;

C.    For actual damages, punitive damages, and Defendant's profits to be determined at trial, together with prejudgment and post judgement interest;

D.  For statutory damages of $150,000 per infringement pursuant to 17 U.S.C. § 504, at Plaintiff's election;

E.  For judgment against the Defendant for the reasonable value of the services rendered to the Defendant;

F.  For an award of reasonable attorney's fees and costs under 17 U.S.C. § 505; and

G.  For such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff respectfully demands trial by jury on all claims so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.