**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

iPURUSA, LLC,

       *Plaintiff,*

    v.

THE BANK OF NEW YORK MELLON
CORPORATION, Q2 STRATEGIES, LLC,
AHEAD, JOHN DOE 1-5, MARY DOE 1-5
and/or ABC 1-5 and/or DOE
CORPORATION 1-5, (fictitious name),
DOE SNOW CORPORATION 1-5,

       *Defendants*.

Civil Action No. 22-cv-00966

**OPINION**

**John Michael Vazquez, U.S.D.J.**

    This case concerns alleged infringement of Plaintiff's automation software. Plaintiff iPurusa, LLC ("iPurusa") sues Ahead, Inc. ("Ahead"); Bank of New York Mellon Corporation ("BNY Mellon"); and Q2 Strategies, LLC ("Q2")[1]; under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a) *et seq.* ("CFAA"); New Jersey's Computer Related Offenses Act, N.J.S.A. § 2A:38A-3 ("CROA"); various common law causes of action, and copyright infringement. Currently pending before the Court are motions to dismiss the Second Amended Complaint filed

---

[1] Data Blue, LLC ("Data Blue") was named as a defendant in prior complaints, but all claims were dismissed as to Data Blue pursuant to a stipulation between Plaintiff and Ahead (the successor by merger to Data Blue). D.E. 70. That stipulation states that "[t]he claims asserted against Defendant Data Blue in Plaintiff's Second Amended Complaint shall be deemed asserted as against Defendant AHEAD as successor by merger to Data Blue LLC, and Defendant AHEAD hereby assumes liability, if any, for such claims asserted by Plaintiff as against Data Blue." *Id.*

by Ahead (D.E. 97), BNY Mellon (D.E. 99) and Q2 (D.E. 112).[2]  The Court reviewed the parties'

submissions[3] and decided the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and

L. Civ. R. 78.1(b).  For the following reasons, Ahead's motion to dismiss is **GRANTED** while

BNY Mellon and Q2's motions to dismiss are **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND[4]

iPurusa is a New Jersey limited liability company which was formed on January 12, 2017

and specializes in software design.  SAC ¶¶ 7, 13, 29.  Shankar Rampersaud is iPurusa's Software

Architect and M. Casey Rampersaud is iPurusa's Managing Member, President, and Creative

Director.  *Id.* ¶ 31.  Plaintiff alleges that "[t]hroughout a four-year time period during 2012-2015,"

before iPurusa was formed, "Shankar implemented, designed, developed the software application

---

[2] The Court previously considered motions to dismiss the Amended Complaint and issued an Opinion and Order on those motions.  D.E. 59 ("Prior Opinion"), 60.  Plaintiff attempted to file the Second Amended Complaint on December 8, 2022 but filed items on the docket without including an amended complaint.  *See* D.E. 62-66.  Plaintiff then filed the Second Amended Complaint on December 10, 2022.  D.E. 67.  That filing was later stricken pursuant to a consent order.  D.E. 93.  Plaintiff agreed to "re-file the SAC without any accompanying exhibits or the exhibit references that currently appear in the SAC" at D.E. 67, and that "[e]xcept for these changes, the re-filed complaint shall be identical to the SAC that was filed by Plaintiff on December 10, 2022."  *Id.* ¶ 2.  Plaintiff re-filed the SAC on February 3, 2023, and that filing is now the operative pleading.  D.E. 100 ("SAC").  In its Prior Opinion, the Court noted that the Amended Complaint was "not a model of clarity."  Prior Opinion at 2 n.4.  That remains true with the SAC, but the Court again endeavors to explain the allegations in a clear manner.

[3] The submissions consist of Ahead's motion to dismiss (D.E. 97); Plaintiff's opposition thereto (D.E. 122); Ahead's reply (D.E. 128); BNY Mellon's motion to dismiss (D.E. 99); Plaintiff's opposition thereto (D.E. 121); BNY Mellon's reply (D.E. 130); Q2's motion to dismiss (D.E. 112); Plaintiff's opposition thereto (D.E. 126); and Q2's reply (D.E. 131).

[4] The factual background is taken from Plaintiff's SAC, D.E. 100, and the Declaration of Shankar Rampersaud attached thereto, D.E. 100-1 ("Shankar Decl.").  The Shankar Declaration contains many additional factual allegations which were not contained in the SAC.  Because the Shankar Declaration is explicitly relied upon in the SAC, the court may consider it for purposes of deciding the motions.  *See U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (explaining that when deciding a motion to dismiss under Rule 12(b)(6), a court may rely on "a document *integral to or explicitly relied upon* in the complaint" (emphasis in original) (citation omitted)).

denominated 'Moksha.'" *Id.* ¶ 21. Plaintiff alleges that it "owns valid copyrights in Moksha . . . which is protected under the laws of the United States, including 17 U.S.C. § 101 *et seq*." *Id.* ¶ 118. Plaintiff also claims that "Moksha was and is completely and totally the original authorship of Shankar and M. Casey for iPurusa." *Id.* ¶ 34.

"Moksha is a computer software application whose main function is to create a software platform and framework that visually creates configuration management workflows that automates 95% of manual tasks." *Id.* ¶ 37; *see also id.* ¶ 39. Plaintiff claims that Moksha, which was allegedly developed in 2012-2015, *id.* ¶ 21, was "created on the PCs and laptops owned and operated by iPurusa," *id.* ¶ 38. But, again, iPurusa was not formed until 2017. *Id.* ¶ 29. Plaintiff also alleges that "Moksha was enhanced by Shankar on March 2017 to enable its users to gain access to more user management features." *Id.* ¶ 35. As conceived, Moksha's "end-users were to be assignees such as iPurusa[5] and entities like BNY Mellon whose access was to be limited by the control and custody of iPurusa on a per project basis." *Id.* Plaintiff claims that "[s]uch limited-use license is evident in the End-User License Agreement embedded in Moksha, to wit: 'iPurusa, LLC grants you a revocable, non-exclusive, nontransferable, limited license to download, install and use the Application solely for your personal, non-commercial purposes strictly in accordance with the terms of this Agreement.'" *Id.*

Plaintiff alleges that on or about May 1, 2017, both Shankar Rampersaud and M. Casey "entered into a contract to work as . . . independent contractor[s] with Data Blue." *Id.* ¶ 42. Ahead later merged with Data Blue, with Ahead being the successor entity. *Id.* ¶ 12; D.E. 70. Plaintiff continues that on that same day, "iPurusa and Data Blue entered into a signed contract with iPurusa

---

[5] While Plaintiff refers to iPurusa as an "assignee," all of Plaintiff's claims appear to rest on the theory that iPurusa, the only Plaintiff in this matter, owns Moksha.

as an independent contractor of Data Blue providing engineering services to BNY Mellon." SAC ¶ 45. Shankar was primarily responsible for providing the services. *Id.* Plaintiff alleges that Shankar's duties, as explained to him by a BNY Mellon employee, were to "assist in managing the virtual device infrastructure." *Id.* ¶ 46. Shankar allegedly performed these services "on BNY Mellon PC/laptop owned by BNY Mellon and operated by BNY Mellon." *Id.*

On or about January 1, 2019, Plaintiff alleges that "Q2 Strategies entered into a verbal agreement with iPurusa as an independent contractor of Q2 Strategies providing Engineering services to BNY Mellon." *Id.* ¶ 47. Shankar's duties for BNY Mellon were unchanged, and he continued to perform his work "on BNY Mellon PC/laptop owned by BNY Mellon and operated by BNY Mellon." *Id.* ¶ 48. Plaintiff also alleges that Q2 hired Shankar both as an employee and as an independent contractor from January 2019 to March 2021. *Id.* ¶ 51.

The SAC then alleges that "[f]rom February 24, 2020, through March 3, 2021, a series of events occurred culminating to Shankar and iPurusa being locked out of the Moksha software by BNY Mellon despite efforts to recover the software." *Id.* ¶ 54. Plaintiff further claims that "BNY Mellon acted in concert with Q2 strategies and Data Blue (AHEAD)." *Id.* ¶ 56. As to Data Blue/Ahead, Plaintiff alleges that "[w]ithout consulting Plaintiff or obtaining its permission or ratification, BNY Mellon and Data Blue (AHEAD) entered into a 'Master Services Agreement' ('MSA'), which, among other things, purports to sell Plaintiff's intellectual property, among Plaintiff's intellectual property is Moksha." *Id.* ¶ 57. As to Q2, Plaintiff alleges that "[l]ikewise, without consulting Plaintiff or obtaining permission or ratification, BNY Mellon and Q2 Strategies entered into a 'Consulting Services Agreement' ('CSA') which, among other things, purports to sell Plaintiff's intellectual property, which includes Moksha." *Id.* ¶ 58. Plaintiff then states that "[n]either the MSA nor the CSA was signed by or mentions iPurusa, Shankar Rampersaud, or M.

4

Casey Rampersaud.  The MSA and CSA likewise do not explicitly mention the Moksha software."

*Id.* ¶ 61.  The SAC excerpts the following provisions of the MSA:

> 7.2 Developed Material. BNYM will own all Intellectual Property Rights in and have the sole right to use all Deliverables and other work product and intellectual property created by Supplier for BNYM under this agreement (collectively, 'Developed Material'). Developed Material will be deemed to be works made for hire owned by BNYM upon their creation. To the extent that any such Developed Material is not deemed to be a works made for hire and the property of BNYM by operation of Law, Supplier irrevocably assigns, transfers and conveys to BNYM, without further consideration, all of its right, title and interest (including all Intellectual Property Rights) in and to such Developed Material. Supplier shall execute such documents or take such actions as BNYM may reasonably request to perfect BNYM's ownership of Developed Material. Supplier will promptly disclose the creation of Developed Material to BNYM.
>
> 7.3 Supplier Material. BNYM's ownership of Developed Material that incorporates any material created and owned by Supplier outside this Agreement ('Supplier Material') will be subject to Supplier's ownership of such Supplier Material. Unless otherwise agreed in a separate written license agreement executed by the Parties, Supplier grants to BNYM (and its Affiliates) a non-exclusive, royalty-free, perpetual, irrevocable, transferable, fully paid-up, worldwide license, with a right to sublicense, to use, copy, modify, display, distribute, perform and create derivative works from Supplier Material that is incorporated into any Developed Material or is reasonably required to Use any Developed Material in a cost-effective manner (e.g., tools). Supplier shall obtain BNYM's written approval prior to incorporating any Supplier Material into any Developed Material.
>
> 7.4 Third Party Material. Supplier will not incorporate any third-party proprietary materials, information, or intellectual property ("Third Party Material") into a Deliverable or other work product to be delivered to BNYM without BNYM's prior written consent.
> . . .
>
> 10.3 Non-Infringement. Supplier warrants that (i) Supplier will perform its responsibilities under this Agreement in a manner that does not infringe or misappropriate any Intellectual Property Rights of any third party; (ii) Supplier has all rights and licenses necessary to convey to BNYM the ownership of (or license rights to Use) all

Intellectual Property Rights in Deliverables and other materials provided to BNYM; and (iii) no Deliverables or other materials provided to BNYM, nor their use, will infringe or constitute a misappropriation of any Intellectual Property Rights of any third party.

*Id.* ¶ 59.  The SAC also excerpts the following provisions of the CSA:

6. Proprietary Rights. A. As used in this Agreement, the term 'Materials' means (i) all deliverables, and (ii) all data, information, materials, documentation. software, works of authorship, templates, marks, ideas, discoveries, inventions, systems, methods, processes and items that are developed or conceived by either party, or that are disclosed or provided to BNYM, in connection with this Agreement or any Work Statement. BNYM shall retain sole ownership of all Materials, and the Materials shall be considered work made for hire and made in the course of the services rendered hereunder. To the extent that any Materials may not be considered a work made for hire, all right, title and interest therein is hereby irrevocably assigned to BNYM. All Materials shall belong exclusively to BNYM with BNYM having the right to obtain and to hold in its own name copyrights, patents, applications, registrations, or such other protection as may be appropriate to the subject matter, and to any extensions and renewals thereof. . . .

7. Infringement. Company warrants that all Materials prepared for BNYM hereunder, as well as any and all data, methods, processes, materials and information used in preparation thereof, is original to Company, or is property which Company has the unrestricted right to use, and that no portion of it is either derived from nor infringes upon any patent, copyright, trade secret or other property right of any other person or is subject to any interest, proprietary or otherwise, or any claim of any third party. Company hereby agrees to indemnify and save BNYM harmless from any loss, claim, liability, damage, cost, or expense of any kind, including reasonable attorney's fees, to which BNYM may be subjected by virtue of a breach or claimed breach of any of the warranties contained in this Section and further agrees to defend BNYM against any and all such claims.

*Id.* ¶ 60.[6]

---

[6] In support of its motion, Ahead filed the entire MSA.  D.E. 97-2.  BNY Mellon also filed the entire CSA in support of its prior motion to dismiss.  D.E. 34-4.  The Court may consider the MSA and CSA as documents that are integral to and explicitly relied upon in the SAC.  *See U.S. Express*

The SAC itself does not mention how BNY Mellon came into possession of Moksha, or how Plaintiff was allegedly "locked out of the Moksha software by BNY Mellon." *Id.* ¶ 54. Additional allegations are found in the Declaration of Shankar Rampersaud, which is attached to the SAC. D.E. 100-1.

Shankar claims that once he began working at BNY Mellon, he "presented two (2) options for how BNY [Mellon] could automate its planned deployment of forty thousand (40,000) virtual computers to its users." Shankar Decl. ¶ 6. One option "would entail [Shankar] presenting Moksha Automation Suite as a solution that could satisfy all of [BNY Mellon's] requirements." *Id.* Shankar claims that Mark Szpakowski, his supervisor at BNY Mellon, "trusted [Shankar] to install Moksha Automation Suite . . . on [Shankar's] primary BNY Mellon computer and a couple test computers for the demo." *Id.* Shankar claims there was a "gentleman's handshake" pursuant to which Szpakowski "said he would purchase a license for Moksha Automation Suite as the deployments were in progress." *Id.*

Shankar then claims that Szpakowski "asked [Shankar] to install Moksha Automation Suite on [Shankar's] computer and prove that it could indeed do everything." *Id.* ¶ 7. Szpakowski allegedly approved Shankar's "request to email a copy of the Moksha binaries from [Shankar's] home office email to [Shankar's] BNY Mellon email address." *Id.* Shankar indicates that by June 20, 2017, Moksha "was installed, configured and ready to deploy as a Proof-of-Concept at BNY

---

*Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (explaining that when deciding a motion to dismiss under Rule 12(b)(6), a court may rely on "a document *integral to or explicitly relied* upon in the complaint" (emphasis in original) (citation omitted)); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.").

Mellon.  One week later, on June 27th, 2017, Moksha Automation Suite is live on the network at BNY Mellon as a production application on a few production computers." *Id.* ¶ 7i.  Shankar claims that on June 27, 2017, he and Szpakowski made a verbal agreement, "on a gentleman's handshake, that if indeed Moksha Automation Suite could prove itself capable of deploying one thousand (1,000) desktops a day, as [Shankar] promised, [Szpakowski] would work with the Procurement and Finance departments to buy a license for Moksha Automation Suite from [iPurusa]." *Id.*

Shankar explains that he "built the workflows that Moksha Automation Suite executed over a thousand (1,000) times a day and was able to successfully prove that the product was capable of what [Shankar] had promised." *Id.* ¶ 8.  Shankar then claims that he "made sure that Mark Szpakowski was aware that the workflows [Shankar] built using Moksha was the bank's property, not [Shankar's], as it was created on the bank's time, but that the execution engine, Moksha itself, was what made it all possible." *Id.*  Shankar explains as follows:

> [O]ne can think of Moksha as the Microsoft Excel application, and the workflows I built as a Microsoft Excel spreadsheet.  While the workflows can only be created, modified and executed by Moksha, e.g., Excel, *the possession of an Excel spreadsheet does not mean that you own Microsoft Excel*.  You own the spreadsheet end-product, not the engine that creates and executes it.  Having worked in IT for decades, Mark Szpakowski was acutely aware of the difference.

*Id.* (emphasis in original).  Shankar claims that he presented a demo of Moksha to Szpakowski's "senior team members" and that "everyone seemed happy to hear that we had already deployed several thousand virtual desktops." *Id.*  Shankar states that he later presented Moksha to John Weir, Global Head of IT, and later to Weir's replacement, Andrew Stokes.  *Id.*

Shankar states that he met with Szpakowski on July 20, 2017 "to discuss the pricing model for purchasing Moksha" and that Szpakowski stated that he had "been in talks with Procurement but that it would take quite some time." *Id.* ¶ 9.  Shankar claims that "because of this verbal

agreement with [Szpakowski], [Shankar] updated the 30-days license key in Moksha Automation Suite and changed it to an expiration date of January 1st, 2019." *Id.* According to Shankar, this license key "ensure[s] that even if the application is provided to corporate partners to test/use/deploy, there is an inherent timeframe upon which an agreement must be reached, or the license key will expire, and the software would be rendered unusable." *Id.*

Shankar continues that after making "significant improvements in the deployment and execution speed of Moksha," he again "email[ed] a copy of Moksha to BNY Mellon." *Id.* Shankar states that on March 15, 2018, he "started documenting that Moksha was the engine that was being used to power all the automation at BNY Mellon." *Id.* Shankar claims that his "admin account at BNY Mellon did not allow [Shankar] to package and install software," and thus he "*did not install Moksha on BNY production employee computers.*" *Id.* ¶ 11i (emphasis in original). Shankar adds that "[a]t no point was [Shankar] ever able to, nor did [he] package and deploy and install Moksha on a production employee computer." *Id.* Shankar claims that "[t]he entire process of Moksha Automation Suite software delivery and installation on all 95,000 computers at BNY Mellon was 100% performed by employees of BNY Mellon" and that "[t]he installation was done without [Shankar's] knowledge however Mark Szpakowski promised to purchase a license[.]" *Id.* Shankar provides that "[a]s of June 11th, 2018, iPurusa LLC's copyright mark is visible across the entire Moksha Automation Suite platform of tools and all employees of BNY Mellon see the copyrighted splash screen every day[.]" *Id.* ¶ 13. Plaintiff also alleges that BNY Mellon was "using over a dozen demo versions of sub-applications of Moksha Automation Suite," including one called "Moksha Tiberius." *Id.*

Shankar alleges that on January 1, 2019, the license key for Moksha expired, rendering the software "unusable." *Id.* ¶ 14. Users who attempted to use the software saw the following

message: "*Moksha Automation Suite by iPurusa LLC is operating under an expired license, therefore the application will now exit*."   *Id.* (emphasis in original).   Shankar states that he "reminded Mark Szpakowski that the whole reason we were in this predicament was because he was abusing the use of Moksha, and that after this debacle was resolved, he would have to decide to either purchase a license or remove Moksha Automation Suite from all computers at BNY Mellon."   *Id.*   Shankar continues that "[w]ith Mark Szpakowski's promise that he would speed up the license purchase agreement, I immediately updated the license key to add an additional four (4) months to Moksha Automation Suite."   *Id.*   The same day, Shankar and iPurusa's "contract with Data Blue was terminated and a new contract was put into effect with Q2 Strategies. [Shankar] was now switched form being sourced by Data Blue to being sourced by Q2 Strategies."   *Id.*

On March 28, 2019, Shankar claims that he "spoke with Mark Szpakowski and other senior managers on his team to let them know that the April 30th expiration date of Moksha Automation Suite was once against set to popup on 95,000 computers globally."   *Id.* ¶ 15.   Shankar apparently extended the license key again, and Szpakowski "continue[d] to promise that he would make good on his word."   *Id.*   On October 6, 2019, Shankar states that he provided Szpakowski "with a license fee price, a subscription model price, and an intellectual property price for Moksha Automation Suite."   *Id.* ¶ 17.   Nonetheless, on March 31, 2020, Shankar claims that the license key expired for a third time.   *Id.* ¶ 18.   Shankar states that Szpakowski again "promise[d] to accelerate the purchase agreement" and Shankar "extended the license for another year" but "made it clear . . . that under no circumstances would [Shankar] update the license key again a fourth time, that BNY Mellon

had to make a decision to purchase a license for its commercial use of Moksha Automation Suite or remove it from its environment."[7]  *Id.*

Shankar claims that BNY Mellon hired a company "to audit all its installed software."  *Id.* ¶ 19.  Shankar states that in January 2020, "it came to the attention of the auditors that Moksha Automation Suite by iPURUSA LLC was a third-party vendor application with which BNY Mellon had no contractual agreement."  *Id.* ¶ 20.  Shankar claims that "[t]o cover up this potential scandal and audit failure, on February 25th, 2021, Mark Szpakowski and Michael Wood called [Shankar] . . . to discuss sanitizing Moksha Automation Suite so they could pass the compliance audit."  *Id.*  Shankar states that "they bullied and coerced me to delete all references to iPURUSA LLC from Moksha Automation Suite and provide them with a clean copy that said 'Copyright BNY Mellon' so they could pass the audit."  *Id.*  Shankar refused to do so, and states that after several days of "high-pressure coercive calls," he was "locked out of [his] computer at BNY Mellon."[8]  *Id.*  Shankar notes that he "contacted both Michael Wood and Mark Szpakowski, but

---

[7] It is unclear how BNY Mellon is continuing to use Moksha because the license key allegedly expired on March 31, 2021, which rendered the software "unusable" according to Shankar. Shankar Decl. ¶¶ 9, 18.  As a result, BNY Mellon has not been able to access Moksha since March 31, 2021 at the latest.  If accurate, this allegation apparently undercuts most, if not all, of Plaintiff's claims.  However, because Defendants have not raised this argument, the Court declines to address it *sua sponte*.

[8] While Shankar claims that he was "locked out" of his BNY Mellon computer, Shankar Decl. ¶ 20, the SAC claims that Shankar and iPurusa were "locked out of the Moksha software," SAC ¶ 54.  Thus, it is unclear whether Plaintiff is claiming to have lost all ability to use and access Moksha or whether Plaintiff is simply "locked out" of BNY Mellon's computer systems.  Shankar also claims that when he initially gave Moksha to BNY Mellon, he emailed "a *copy* of the Moksha binaries" to his BNY Mellon email address and later, after making "significant improvements," again "email[ed] a *copy* of Moksha to BNY Mellon."  Shankar Decl. ¶¶ 7, 9 (emphasis added). These allegations suggest that Plaintiff has only been prevented from accessing BNY Mellon's computer systems, but that Plaintiff still has access to copies of the Moksha software.  *But see* SAC ¶¶ 83-91 (claiming interference with Plaintiff's business relations and prospective economic advantage based on "Defendant's preventing Plaintiff from accessing Moksha"); ¶ 65 (claiming

they never answered [his] calls." *Id.* Shankar concludes that "it is quite clear that BNY Mellon use of Moksha is unauthorized because iPURUSA did not intend to grant a license to BNY Mellon either express or implied." *Id.*

The present motions followed the SAC, and all Defendants seek dismissal of all claims against them.

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). For a complaint to survive dismissal under Rule 12(b)(6), it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Further, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of her claims." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016). In evaluating the sufficiency of a complaint, district courts must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions and are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). The Court, however, "must accept all of the complaint's well-pleaded facts as true[,]" and grant a plaintiff the benefit of all reasonable inferences arising therefrom. *Fowler*, 578 F.3d at

---

that BNY Mellon violated the CFAA "[b]y locking the owner of Moksha out of Moksha, thereby preventing the owner to use its property").

210.  The factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 545.

## III.    ANALYSIS

### A.  Computer Fraud and Abuse Act as to BNY Mellon

Plaintiff alleges that "[b]y continuing to use Moksha without permission" and "[b]y locking the owner of Moksha out of Moksha," BNY Mellon has "exceeded and continues to exceed it authority to access Moksha," in violation of the CFAA.  SAC ¶¶ 64-65.  The CFAA creates criminal penalties for certain computer related offenses, but also creates a private cause of action for "[a]ny person who suffers damage or loss by reason of a violation of this section."  18 U.S.C. § 1030(g).  A violation occurs when a defendant "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer[.]"[9]  18 U.S.C. § 1030(a)(5)(A).  Additionally, a civil action is only available if the violation "involves 1 of the factors set forth in subclauses (I), (II), (IV), or (V) of subsection (c)(4)(A)(i)."  18 U.S.C. § 1030(g).  Relevant here, subsection (c)(4)(A)(i)(I) creates liability where the offense caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."  18 U.S.C. § 1030(c)(4)(A)(i)(I).

BNY Mellon argues that "Plaintiff has not and cannot allege any damage to a 'protected computer.'"  D.E. 99-1 at 18.  The CFAA defines "computer" as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions."  18 U.S.C. § 1030(e)(1).  The statute also provides that a "protected computer"

---

[9] While this is not the only statutory basis for liability, it appears to be the provision on which Plaintiff relies.  *See* SAC ¶ 66.

is a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2)(B).[10]

The SAC potentially claims that the Moksha software is the "protected computer." SAC ¶ 65. Plaintiff's opposition brief, however, appears to argue that the computer given to Plaintiff by BNY Mellon is the relevant "protected computer." D.E. 121 at 8 ("Plaintiff's computer, which was connected to the internet, enabling Shankar to do tasks for BNYM from his South River home, is clearly a 'protected computer.'"). To the extent Plaintiff claims that the Moksha software itself is the relevant "computer," Plaintiff presents no authority indicating that software is a "computer" within the meaning of the CFAA. To the extent Plaintiff claims that the BNY Mellon computer given to Plaintiff is the relevant "computer" for this claim, "[i]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[T]he legal theories set forth in

---

[10] Subsection (e)(2)(A) further includes within the definition of a "protected computer" a computer that is "exclusively for the use of a financial institution . . . or, in the case of a computer not exclusively for such use, used by or for a financial institution . . . and the conduct constituting the offense affects that use by or for the financial institution[.]" 18 U.S.C. § 1030(e)(2)(A).

[a brief] are helpful only to the extent that they find support in the allegations set forth in the complaint.").[11]  Thus, Plaintiff's CFAA claim fails and is dismissed.[12]

## B.  Computer Related Offenses Act as to BNY Mellon

Count Two alleges that BNY Mellon violated the New Jersey CROA.  "The New Jersey Computer Related Offenses Act makes it unlawful to alter, damage, access, or obtain data from a computer without authorization."  *In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 262, 277 (3d Cir. 2016).  The statute grants a private right of action to

> [a] person or enterprise damaged in business or property as a result of . . .  [t]he purposeful or knowing, and unauthorized altering, damaging, taking or destruction of any data, data base, computer program, computer software or computer equipment existing

---

[11] Even if the Court considered BNY Mellon's computer that it issued to Shankar to be the "protected computer," the claim is flawed.  The statute requires that the defendant "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damages *without authorization*, to a protected computer."  18 U.S.C. § 1030(a)(5)(A) (emphasis added); *see CollegeSource, Inc. v. AcademyOne, Inc.*, 597 F. App'x 116, 129 (3d Cir. 2015) (noting that the term "authorization" is not defined by the statute, but "should be given its common usage, without any technical or ambiguous meaning" (citation and internal quotation marks omitted)).  BNY Mellon cannot have acted "without authorization" in making a transmission to its own computer.  *Rodgers Grp., LLC v. Lewis*, No. 22-482, 2022 WL 4095785, at *7 (D.N.J. Sept. 7, 2022) ("[T]hose with authorization do not violate the CFAA[.]"); *Volpe v. Abacus Software Sys. Corp.*, 2021 WL 2451968, at *3 (D.N.J. June 16, 2021) ("The touchstone of a CFAA claim is the 'unauthorized' access of computers." (citation and internal quotation marks omitted)).

[12] BNY Mellon also argues that Plaintiff has failed to plead sufficient loss as required by the CFAA.  D.E. 99-1 at 21-23; 18 U.S.C. 1030(c)(4)(A)(i)(I).  "Loss" is defined in the statute as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  Some courts have found that "the meaning of loss under the statute must pertain to 'a cost of investigating or remedying damage to a computer, or a cost incurred because the computer's service was interrupted.'"  *Chas S. Winner, Inc. v. Polistina*, No. 06-4865, 2007 WL 1652292, at *4 (D.N.J. June 4, 2007) (citing *Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004)); *Volpe*, 2021 WL 2451968, at *6 (stating that "'loss' must generally be in some way related to the functionality of the protected computer at issue" (citation and internal quotation marks omitted)).  Because Plaintiff has failed to state a cognizable theory of liability under the CFAA, the Court declines to reach this issue.

> internally or externally to a computer, computer system or computer network.

N.J.S.A. § 2A:38A-3a.[13]  Plaintiff alleges that "[b]y locking Plaintiff out of Moksha" and "using Moksha," BNY Mellon has violated this provision and caused "Plaintiff damage to its business and property." SAC ¶¶ 69-70.

BNY Mellon argues that this claim should be dismissed because Plaintiff has not adequately pled that it was "damaged in business or property." D.E. 99-1 at 24-25. "To recover under CROA, a plaintiff must show he was 'damaged in business or property by the defendant's violation of the act.'" *Lexpath Techs. Holdings, Inc. v. Welch*, 744 F. App'x 74, 82 (3d Cir. 2018); *Rodgers Grp.*, 2022 WL 4095785, at *8 ("[T]he NJCROA allows for a broader allegation of damages than the CFAA, which can include losses unrelated to the damage or impairment of a computer system."). The Court can reasonably infer that, assuming the accuracy of Plaintiff's allegations that it has not been paid for BNY Mellon's partially unauthorized use of Moksha, such losses are damages to business or property pursuant to the CROA. Thus, Count Two will not be dismissed on this basis.

BNY Mellon further claims that the MSA and CSA "made it reasonable for [BNY Mellon to] believe that as soon as Rampersaud provided the Moksha software to [BNY Mellon, BNY Mellon] was the rightful owner of, and had free rein to perpetually use, the software." D.E. 99-1 at 26. BNY Mellon argues that the MSA and CSA therefore demonstrate that "there is simply no basis for Plaintiff to allege that [BNY Mellon] *purposely or knowingly* made an unauthorized taking of the Moksha software." *Id.* at 26 (emphasis in original). While the MSA and CSA may affect a fact-finder's determination of whether BNY Mellon acted purposefully or knowingly,

---

[13] There are other bases for liability under the statute, but Plaintiff does not appear to assert them. *See* SAC ¶ 69; D.E. 121 at 9.

these agreements do not eliminate the reasonable inference that BNY Mellon knew it was not entitled to continue using Moksha without paying once Plaintiff purportedly revoked BNY Mellon's authorization. *See* SAC ¶ 100. Shankar claims that he discussed BNY Mellon's purchase of Moksha or a license to use Moksha on multiple occasions with Szpakowski and that Szpakowski made representations that BNY Mellon would make such a purchase. *See, e.g.*, Shankar Decl. ¶¶ 14-15, 17. Such allegations lead to a reasonable inference that BNY Mellon knew it did not own or have "free rein to perpetually use" Moksha and thus took the alleged actions purposefully or knowingly. Thus, BNY Mellon's motion is denied as to Count Two.

### C. Conversion as to all Defendants

Count Three alleges conversion as to all Defendants, SAC ¶ 78, and all Defendants move to dismiss. Under New Jersey law,[14] "[c]onversion is the 'wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights.'" *O'Brien Oil Pollution Serv., Inc. v. Kapoor*, No. 06-2945, 2009 WL 2407399, at *2 (D.N.J. Aug. 4, 2009) (citation omitted). "[T]he tort of conversion may be applied only to interference with tangible property, and courts have consistently held that intangible property cannot be the subject of such a claim." *Id.*; *see also Slim CD, Inc. v. Heartland Payment Sys., Inc.*, No. 06-2256, 2007 WL 2459349, at *12 (D.N.J. Aug. 24, 2007) ("[C]ourts in [the District of New Jersey] have held that intangible property cannot be the subject of a conversion claim." (citation omitted)).

Defendants first argue that Plaintiff's conversion claim is preempted by the Copyright Act. A common law claim is preempted by the Copyright Act under § 301 if

> (1) the particular work to which the state law claim is being applied
> falls within the type of works protected by the Copyright Act under

---

[14] All parties cite to New Jersey law, and much of the alleged conduct appears to have taken place in New Jersey. *See* SAC ¶¶ 49-51. Seeing no reason to depart, the Court applies New Jersey law to Plaintiff's state law claims.

> Sections 102 and 103; and (2) the state law seeks to vindicate "legal or equitable rights that are equivalent" to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106.

*Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.*, 210 F.Supp.2d 552, 563 (D.N.J. 2002).

Computer software falls "within the type of works protected by the Copyright Act." *Expediters Int'l of Wash., Inc. v. Direct Line Cargo Mgmt. Servs., Inc.*, 995 F. Supp. 468, 479 (D.N.J. 1998).

As to the second element:

> [A] right which is "equivalent to copyright" is one which is infringed by the mere act of reproduction, performance, distribution or display. . . .  If, under state law, the act of reproduction, performance, distribution or display . . . will in itself infringe the state created right, then such right is preempted.  But if other elements are required, in addition to or instead of, the acts of reproduction, performance, distribution or display, in order to constitute a state created cause of action, then the right does not lie "within the general scope of copyright," and there is no preemption.

*SBK Catalogue P'ship v. Orion Pictures Corp.*, 723 F. Supp. 1053, 1066 (D.N.J. 1989) (citing 1 Nimmer, The Law of Copyright § 1.01[B][1] at 1–12–13 (1984)).  "A state law claim is not preempted if the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Expediters Int'l*, 995 F. Supp. at 479-80 (citation omitted). But where a "Plaintiff fails to distinguish the underlying factual predicate of his infringement claim with that of his state law claims," the state law claims are preempted. *Winstead v. Jackson*, No. 10-5783, 2011 WL 4407450, at *4 (D.N.J. Sept. 20, 2011).

The tangible property requirement of conversion cuts against a preemption finding.[15]  *See Video Pipeline*, 210 F. Supp. 2d at 568 ("'The torts of conversion and trespass relate to interference

---

[15] The Court assumes without deciding that Plaintiff's conversion claim is not preempted. However, to the extent the claim relies solely on intangible property, it would appear to be preempted by the Copyright Act. *See Mktg. Info. Masters, Inc. v. Bd. of Trs. of Cal. State Univ. Sys.*, 552 F. Supp. 1088, 1098 (S.D. Cal. 2008) ("While conversion is generally immune from

with tangible rather than intangible property, and hence should be held immune from preemption.'" (quoting 1 Nimmer, The Law of Copyright § 1.01[B][1][i], at 1-41 (2001))).  At the same time, the requirement is fatal to Plaintiff's claim because Plaintiff has not alleged any interference with its *tangible* property.  *See StrikeForce Techs., Inc. v. WhiteSky, Inc.*, No. 13-1895, 2013 WL 3508835, at *8 (D.N.J. July 11, 2013) ("Software code . . . ha[s] generally been recognized as intangible property[.] . . . Misuse of data or confidential software information . . . does not state a cognizable conversion claim."); *see also Argush v. LPL Fin. LLC*, No. 13-7821, 2014 WL 3844822, at *6 (D.N.J. Aug. 5, 2014) ("[A] claim for conversion of intangible property, such as electronic files or information, will not lie." (citation omitted)).

Plaintiff claims that "computer software is, in fact, tangible property."  D.E. 126 at 16-17.  In support, Plaintiff cites to *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 676 (3d Cir. 1991).[16]  That case is inapposite.  The *Advent Systems* court, applying Pennsylvania law, noted that "once in the form of a floppy disc or other medium, the [computer] program is tangible, moveable and available in the marketplace" and thus constitutes a "good" under the Uniform Commercial Code.  *Id.* at 675-76.  The SAC, however, does not allege that Moksha has ever been embodied in a physical medium (such as a disk or hard drive belonging to iPurusa) over which BNY Mellon wrongfully exercised dominion control.  *See Apparel Bus. Sys., LLC v. Tom James Co.*, No. 06-1092, 2008 WL 858754, at * 19 (E.D. Pa. Mar. 28, 2008) ("[T]he defendants have not

---

preemption because it involves tangible property, conversion actions seeking only damages for reproduction of the property—not return of tangible property—are preempted by the Copyright Act." (citation omitted)); *Tegg Corp. v. Beckstrom Elec. Co.*, 650 F. Supp. 2d 413, 433-35 (W.D. Pa. 2008) (dismissing plaintiff's conversion claim on preemption grounds after finding that the claim regarded "the software itself, not merely a physical embodiment of it").

[16] The Court assumes without deciding that *Advent Systems*, which was decided under the auspices of the Uniform Commercial Code and applied Pennsylvania law, is applicable to Plaintiff's conversion and trespass to chattels claims, brought under New Jersey law.

carried off a disk containing the plaintiff's program and refused to give it back.  The plaintiff's rights in its intangible property, the software, are not embodied in a particular document, and the software is not subject to conversion."); *Video Pipeline*, 210 F. Supp. 2d at 568-69 (finding a conversion claim was plausibly pled where it alleged that the party "exercised control and custody over *physical copies* of their [movie] trailers" (emphasis added)).  The Court recognizes that Moksha was arguably contained within BNY Mellon's computers and/or servers—*i.e.*, in a physical medium—but this tangible property, even assuming it was converted by someone, belongs to BNY Mellon and not Plaintiff.  Thus, Plaintiff's conversion claim does not plausibly allege that any Defendant wrongfully exercised dominion or control over *Plaintiff's tangible property*.  Count Three is dismissed as to all Defendants.

Q2 also argues that the conversion claim fails because the SAC does not allege that they ever exercised dominion and control over Moksha or had access to Moksha.  D.E. 112-1 at 10 n.5.  The Court agrees.  Plaintiff's allegations indicate that Shankar gave Moksha directly to BNY Mellon, and no allegations exist to show that Q2 was even aware of the existence of Moksha.  Thus, Count Three fails as to Q2 for this additional reason.

### D.  Trespass to Chattels as to all Defendants

All Defendants claim that the trespass to chattels claim is preempted.  While Plaintiff has not established that such a claim is recognized by New Jersey law, the traditional elements of trespass to chattels are the intentional "(a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another."  Restatement (Second) of Torts § 217 (Am. L. Inst. 1965); *Knox v. Samsung Elecs. Am., Inc.*, No. 08-4308, 2009 WL 1810728, at *8 (D.N.J. June 25, 2009) (assuming that "New Jersey recognizes the tort of trespass to chattels via the Restatement").  "[L]ike conversion, trespass to chattels requires tangible personal property[.]"

*Barrett Fin. of N. Jersey, LLC v. Creative Fin. Grp. of N.J.*, No. 13-5621, 2018 WL 3546196, at *11 (D.N.J. July 24, 2018) (citing Restatement (Second) of Torts §§ 216-217 (Am. Law. Inst. 1965)).   Plaintiff claims that "all three (3) Defendants have intentionally intermeddled with Moksha, which belongs to Plaintiff."  SAC ¶ 81.  The Court assumes without deciding that the tangible property requirement renders this claim, like the conversion claim, not preempted by federal copyright law.  However, Count Four fails for the same reason as Plaintiff's conversion claim—Moksha itself is not tangible property, and to the extent it was embodied in BNY Mellon's computer systems, such systems do not belong to Plaintiff.

And again, this claim fails as to Q2 because Plaintiff has not alleged that Q2 intermeddled or interfered with Moksha in any way.  By Plaintiff's own admission, Shankar gave Moksha directly to BNY Mellon, and nothing in the SAC or Shankar Declaration indicates that Q2 had any access to, or even knowledge of, Moksha.

### E. Intentional Interference with Business Relations and Prospective Economic Advantage as to BNY Mellon

Count Five alleges intentional interference with business relations and prospective economic advantage as to BNY Mellon.  To state such a claim, a plaintiff must allege the following:

> (1) it had a continuing or prospective economic relationship or reasonable expectation of economic advantage; (2) the defendant knew of such relationship of expectancy; (3) the interference and harm inflicted were done intentionally and with "malice" in the sense of conduct that is wrongful and without justification or excuse; (4) if not for the interference, it was reasonably probable that plaintiff would have realized its economic advantage; and (5) the plaintiff was injured as a result of defendant's conduct.

*Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 493-94 (D.N.J. 1998) (citation omitted).

BNY Mellon first argues first that this claim is preempted by the Copyright Act, D.E. 99-1 at 26-27, but presents no binding or in-district authority.  Given that the tort has additional

elements not present in a copyright claim, the Court assumes without deciding that Count Five is not preempted by federal copyright law.

BNY also argues that Count Five should be dismissed for failure to state a claim because it is "nothing more than threadbare recitals of the elements of the cause[] of action." D.E. 99-1 at 31. The Court agrees. The SAC alleges that "[a]s a result of Defendant's preventing Plaintiff from accessing Moksha, Plaintiff's [*sic*] has been unable to take advantage of these opportunities." SAC ¶ 84. What constitutes "these opportunities" is entirely unclear from the face of the SAC.

In its opposition brief, Plaintiff notes that it "alleges in the SAC that at the end of 2016, Moksha was demonstrated to Eden Technologies, and subsequently installed on a server at this company where it was tested (SAC ¶ 40) and that this contact was renewed during August 2018 ([Shankar Decl.] ¶ 12)." D.E. 121 at 15. But the SAC specifically alleges that "[t]his joint venture between iPurusa and Eden Technologies did not come to fruition and Moksha was removed from the server at Eden Technologies." SAC ¶ 40. And the Shankar Declaration only states that "[o]n August 3rd, 2018, [Shankar] engaged with Andrew Sweeney, Managing Partner at Eden Technologies, in a bid to sell Moksha Automation Suite." Shankar Decl. ¶ 12. Merely "engag[ing]" with someone "in a bid to sell Moksha" does not sufficiently allege a continuing economic relationship or a reasonable expectation of economic advantage. Plaintiff has also failed to allege that BNY Mellon knew that Plaintiff had "engaged" with Eden Technologies or that BNY Mellon took any action with malice. Moreover, it is unclear how BNY Mellon's alleged conduct could have interfered with Plaintiff's "bid to sell Moksha" in 2018. And finally, it is implausible that Plaintiff has been entirely prevented from accessing Moksha when Shankar claims to have given BNY Mellon *copies* of the software. Shankar Decl. ¶¶ 7, 9. Plaintiff's claim is deficient and is dismissed.

### F. Negligent Interference with Business Relations and Prospective Economic Advantage as to all Defendants

Count Six alleges "negligent interference with business relations and prospective economic advantage as to all defendants."  In New Jersey, "[n]o reported decision has recognized a cause of action for negligent interference with prospective economic advantage."  *Enriquez v. Johnson & Johnson*, No. L-4677-18, 2019 WL 5586557, at *13 (N.J. Super. Ct. Oct. 10, 2019).  Plaintiff has not pointed to any case establishing the existence of such a claim, and the Court's independent research does not reveal any.  Thus, Count Six is dismissed.  Even if such a claim existed, or even if Plaintiff intended to assert an intentional interference claim, it would be deficient for many of the same reasons as Plaintiff's intentional interference claim against BNY Mellon—Plaintiff has not plausibly alleged a continuing or prospective business relationship or reasonable expectation of economic advantage, or that it was reasonably probable that Plaintiff would have realized its economic advantage but for Defendants' actions.

### G. Breach of the Implied Covenant of Good Faith and Fair Dealing as to all Defendants

Count Seven alleges breach of the implied covenant of good faith and fair dealing as to all Defendants.  "Every contract contains an implied covenant of good faith and fair dealing."  *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002) (citation omitted).  "Under such a covenant, neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.* (citation and internal quotation marks omitted).  Plaintiff acknowledges that it is not a party to the MSA or CSA but claims that it can enforce the implied covenant of good faith and fair dealing as a third-party beneficiary of those agreements.  D.E. 126 at 19-20; D.E. 121 at 16-17.

To determine if a plaintiff is an intended third-party beneficiary of a contract, and thus entitled to sue to enforce the contract, the "test is whether the contracting parties intended that a

third party should receive a benefit which might be enforced in the courts." *Pollack v. Quick Quality Rests., Inc.*, 172 A.3d 568, 575 (App. Div. 2017) (citation and internal quotation marks omitted). "The contractual intent to recognize a right to performance in the third person is the key. If that intent does not exist, then the third person is only an incidental beneficiary, having no contractual standing." *Broadway Maintenance Corp. v. Rutgers, State Univ.*, 447 A.2d 906, 909 (N.J. 1982). One who received a benefit "merely as an unintended incident of the agreement" is not an intended third-party beneficiary. *Id.*; *Thomas & Cheryl Koziol, Inc. v. Lasalle Nat'l Bank*, No A-0849-12T4, 2014 WL 1660381, at *4 (N.J. App. Div. Apr. 28, 2014) ("A party who happens to derive an incidental benefit from a contract's performance has no cause of action[.]" (citation omitted)).

iPurusa has failed to plausibly allege that it was an intended third-party beneficiary of the MSA or CSA. Plaintiff alleges that "[n]either the MSA nor the CSA was signed by or mentions iPurusa, Shankar Rampersaud, or M. Casey Rampersaud. The MSA and CSA likewise do not explicitly mention the Moksha software." SAC ¶ 61. Plaintiff has not pointed to any contract provision indicating that iPurusa was an intended beneficiary of the contracts nor has it alleged any facts from the negotiation or course of dealing indicating that the parties entered the contract with iPurusa in mind. Moreover, the MSA was entered into in 2011, more than six years before iPurusa allegedly began working with Data Blue/Ahead and BNY Mellon. D.E. 97-2; SAC ¶¶ 42-45. The CSA was executed by BNY Mellon on February 9, 2018, eleven months before Plaintiff began working with Q2. D.E. 34-4; Shankar Decl. ¶ 14; SAC ¶¶ 47, 51. Plaintiff has not plausibly claimed that it was an intended third-party beneficiary of those agreements. Count Seven is dismissed.

24

**H.  Quantum Meruit as to all Defendants**

Count Eight alleges *quantum meruit* as to all Defendants.  *Quantum meruit* is a quasi-contractual, equitable remedy which is "applicable only 'when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust.'"  *New York-Connecticut Dev. Corp. v. Blinds-To-Go (U.S.) Inc.*, 159 A.3d 892, 901 (App. Div. 2017) (citation omitted); *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992).

The Court noted in its Prior Opinion that Plaintiff's *quantum meruit* claim was preempted "to the extent that the 'services' are simply the access to the Moksha software."  Prior Opinion at 19.  Despite this holding, Plaintiff bases this claim in part on its allegations that "BNY failed to compensate Plaintiff for accessing Moksha," SAC ¶ 99, that BNY continues to "access and utilize Moksha," *id.* ¶ 100, and that BNY Mellon is "using Moksha without paying for it," *id.* ¶ 101.  These claims are again dismissed as preempted.  Because they are the only allegations against BNY Mellon for this claim, Count Eight is dismissed as to BNY Mellon.

Count Eight is also dismissed as to Ahead because no wrongful conduct is alleged as to Data Blue/Ahead.  Plaintiff only alleges as to Ahead that "Shankar was a consultant with Data Blue (now AHEAD) and was being paid on a Corp-to-Corp basis, where iPURUSA LLC would bill Data Blue (AHEAD) for his hours, and Data Blue (AHEAD) would pay iPURUSA LLC on a corporate basis."  SAC ¶ 103.  There are no allegations that Data Blue/Ahead failed to pay iPurusa or took any other wrongful action, and thus, Count Eight is dismissed as to Ahead.

Plaintiff claims that "Q2 Strategies still owes iPurusa LLC $23,906.25 for 225 hours of billed but unpaid time for the period 2/1/2021 through 2/28/2021."  Q2 claims that "[n]o benefit was conferred on Q2 for which Plaintiff/Shankar were not compensated" and that "Plaintiff/Shankar were compensated appropriately."  D.E. 112-1 at 13.  Mere denial of an

allegation, however, is not sufficient to secure dismissal under Rule 12(b)(6). "The District Court must accept all of the complaint's well-pleaded facts as true," *Fowler*, 578 F.3d at 210, and Plaintiff's allegations plausibly state that iPurusa has not been paid for 225 hours of time that it worked. SAC ¶ 105. Thus, Count Eight survives solely on this theory and solely as to Q2.

Q2 alternatively argues that Plaintiff's claim must fail because iPurusa alleges an express contract. D.E. 112-1 at 14. Plaintiff alleges that "[o]n or about January 1, 2019, Q2 Strategies entered into a verbal agreement with iPurusa as an independent contractor of Q2 Strategies providing Engineering services to BNY Mellon." SAC ¶ 47. While "the existence of an express contract excludes *awarding relief* regarding the same subject matter based on quantum meruit," *Kas Oriental Rugs, Inc. v. Ellman*, 926 A.2d at 392 (N.J. App. Div. 2007) (emphasis added), a plaintiff "may state as many separate claims or defenses as it has, regardless of consistency," Fed. R. Civ. P. 8(d)(3). Thus, Plaintiff's allegations of a "verbal agreement" do not warrant dismissal at the 12(b)(6) stage.

### I.   Civil Conspiracy as to all Defendants

Count Nine alleges a civil conspiracy, and claims that the CSA and MSA show that "Defendants acted in concert to illegally use Moksha Automation Suite, thereby infringing Plaintiff's rights to its property." SAC ¶ 109. Under New Jersey law, a civil conspiracy is

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.

*Banco Popular N. Am. v. Gandi*, 184 N.J. 161, 177 (2005) (internal quotations and citation omitted). The Court previously dismissed Plaintiff's civil conspiracy claim because "Plaintiff only allege[d] in conclusory fashion that a conspiracy existed." Prior Opinion at 21. The SAC fares no

better.  Plaintiff only alleges that the MSA and CSA demonstrate the conspiracy and that pursuant to those agreements, "the Defendants acted in concert to illegally use Moksha Automation Suite." SAC ¶ 109.  These contracts, which were entered into before Plaintiff worked with the relevant companies and which do not mention iPurusa or Moksha, do not, without more, demonstrate an agreement to inflict a wrong on Plaintiff.  *See Est. of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239, 244 (3d Cir. 2016) ("A plaintiff must rely on more than his or her own suspicion and speculation to satisfy [the meeting of the minds] requirement.").  Plaintiff's civil conspiracy claim is again dismissed as to all Defendants.[17]

### J.   Unjust Enrichment as to BNY Mellon

Count Ten alleges unjust enrichment against BNY Mellon.  "A cause of action for unjust enrichment requires proof that defendant received a benefit and that retention of that benefit without payment would be unjust."  *Goldsmith v. Camden Cnty. Surrogate's Office*, 975 A.2d 459, 462 (N.J. App. Div. 2009) (citation and internal quotation marks omitted).  The SAC alleges that "by being locked out of Moksha, Plaintiff has suffered and is continuing to suffer irreparable injury for which there is no adequate remedy at law."  SAC ¶ 115.  Plaintiff's position in its opposition is different—asserting that its unjust enrichment claim is based on the allegation that "services were being performed, the Defendant was aware that Plaintiff was performing these services and Defendant never directed Plaintiff to stop performing these services yet failed to continue to pay Plaintiff for these services."  D.E. 121 at 13.  Plaintiff cites to paragraphs 98-107 and 112-16 of the SAC, but the only benefit alleged as to BNY Mellon in those paragraphs is "accessing Moksha past the contract expiration date" and "access[ing] and utiliz[ing] Moksha . . . without paying for

---

[17] Plaintiff did not oppose the portion of Ahead's motion seeking dismissal of the civil conspiracy claim and Count Nine is dismissed as to Ahead for that additional reason.

it."  As the Court explained in its Prior Opinion, allegations stemming from BNY Mellon's use of

Moksha are not "differentiate[d] in any way from the copyright infringement claim" and are thus

preempted.  Prior Opinion at 22-23 (citing *Video Pipeline*, 210 F. Supp. 2d at 567 ("[U]njust

enrichment claims relating to the use of copyrighted material are generally preempted.")).

Plaintiff also cites to paragraphs 48 and 51 of the SAC, which allege that Shankar

performed "various duties as a Senior Technical Engineer" and "Engineering services" for BNY

Mellon through Q2.  SAC ¶¶ 48, 51.  But Plaintiff does not allege that BNY Mellon failed to pay

for these services or that it had any obligation to pay iPurusa at all—the SAC alleges that BNY

Mellon was to pay Q2, which in turn would pay iPurusa.  Thus, Plaintiff has failed to allege that

BNY Mellon received a benefit and that retention of the benefit would be unjust.  Count Ten is

dismissed.

### K.  Copyright Infringement, 17 U.S.C. § 101 *et seq*., as to BNY Mellon

Count Eleven alleges copyright infringement solely as to BNY Mellon.  SAC ¶¶ 117-29.

The Copyright Act grants the owner of a copyright exclusive rights to the protected material.  17

U.S.C. § 106.  "'To establish a claim of copyright infringement, a plaintiff must establish: (1)

ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's

work.'"  *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 203 (3d Cir. 2005) (quoting *Dun &*

*Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir. 2002)).

"Copying refers to the act of infringing any of the exclusive rights that accrue to the owner of a

valid copyright, as set forth in 17 U.S.C. § 106[.]"  *Id.* at 207.  Under § 106, the owner of a

copyright

> has the exclusive rights to do and to authorize any of the following:
> (1) to reproduce the copyrighted work in copies . . . (2) to prepare
> derivative works based on the copyrighted work . . . (3) to distribute

> copies . . . of the copyrighted worked to the public by sale or other
> transfer of ownership[.]

17 U.S.C. § 106.

BNY Mellon does not currently contest Plaintiff's ownership of a valid copyright.  D.E.

99-1 at 11 n.5.  BNY Mellon does, however, argue that Plaintiff has failed to allege an unauthorized

copying.  Plaintiff asserts the following:

> At no time has Plaintiff authorized [BNY Mellon] to reproduce,
> distribute, prepare derivative works, or publicly display [Moksha]
> or any portion thereof.  Plaintiff did not intend to grant a license,
> either express or implied, to Defendant for the use of [Moksha]. . . .
> Despite Plaintiff's lack of authorization, BNY Mellon has used,
> copied distributed and installed Moksha without [Plaintiff's]
> permission, constituting copyright infringement[.]"

SAC ¶ 122.

In its Prior Opinion, the Court dismissed Plaintiff's copyright infringement claim against

BNY Mellon because of an "inherent and critical contradiction"—Plaintiff alleged that it

voluntarily permitted BNY Mellon to use Moksha, but also claimed that it never "sold, shared,

licensed, commission and/or assigned" rights to Moksha.  Prior Opinion at 16-17.  While Plaintiff

removed this language in the SAC, it still appears to rely on a theory that it never authorized BNY

Mellon's use of Moksha while at the same time alleging acquiescence in such use.  Shankar claims

that he installed Moksha on his "primary BNY Mellon computer and a couple test computers."

Shankar Decl. ¶ 6.  Shankar also claims that he emailed copies of Moksha to BNY Mellon.  *Id.* ¶¶

7, 9.  While Shankar claims that "[t]he entire process of Moksha Automation Suite software

delivery and installation on all 95,000 computers at BNY Mellon was 100% performed by

employees of BNY Mellon" and that the "installation was done without [Shankar's] knowledge,"

Shankar Decl. ¶ 11i, Shankar also claims that he acquiesced in BNY Mellon's use of Moksha by

extending the license key various times, *id* ¶¶ 14, 15, 18.  Shankar did so knowing that Moksha

29

was in use on 95,000 BNY Mellon computers.  *Id.* ¶¶ 9, 15.  At the same time, Plaintiff alleges that "[a]t no time has Plaintiff authorized Defendant to reproduce, distribute, prepare derivative works, or publicly display [Moksha]," that "Plaintiff did not intend to grant a license, either express or implied to Defendant for the use of [Moksha]" and that "BNY Mellon has used, copied, distributed and installed Moksha without [Plaintiff's] permission, constituting copyright infringement."  SAC ¶ 122.

Plaintiff's copyright infringement claim thus appears to allege that the infringement took place solely *after* Plaintiff purportedly rescinded the permission it previously granted and was "locked out" of the Moksha software.  SAC ¶¶ 54, 100 (noting that iPurusa sent a cease and desist letter dates March 2, 2021); Prior Opinion at 17 n.15 ("Plaintiff appears to be implicitly arguing that unlawful conduct did not occur until March 3, 2021[.]").  To the extent Plaintiff intended to claim copyright infringement for earlier conduct, such a claim is again dismissed as not plausibly pled.[18]  *See* Prior Opinion at 16-17.

BNY Mellon's remaining argument is that it was granted "an implied license to use, copy and distribute the Moksha software."  D.E. 99-1 at 15.  An implied license is an affirmative defense to a copyright infringement claim.  *Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 275 (3d Cir. 2006).  A non-exclusive license may be granted orally and may be implied by conduct.  *MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769,

---

[18] Plaintiff appears to argue that the End-User License Agreement ("EULA") embedded in Moksha successfully limited BNY Mellon's authorization to use Moksha.  D.E. 121 at 19-20.  The EULA allegedly states that "iPurusa, LLC grants you a revocable, non-exclusive, nontransferable, limited license to download, install and use the Application solely for your personal, non-commercial purposes strictly in accordance with the terms of this Agreement."  SAC ¶ 35; *see also* Shankar Decl. ¶ 13.  Shankar Rampersaud, however, states that he was aware that BNY Mellon was violating this limitation and acquiesced in BNY Mellon continuing to do so.  *See id*. ¶ 9.  Thus, again, Plaintiff has not plausibly stated a claim for any infringement before Shankar purportedly revoked BNY Mellon's authorization.

778-79 (3d Cir. 1991) (citation omitted).  But even if a nonexclusive license exists, such a license "does not transfer ownership of the copyright from the licensor to the licensee" and "the licensor can still bring suit for copyright infringement if the licensee's use goes beyond the scope of the nonexclusive license."  *Id.* at 779.

While it appears that Plaintiff authorized BNY Mellon's use of Moksha up until March 2, 2021, Plaintiff alleges that such authorization was revoked thereafter.  SAC ¶ 100.  The Court cannot determine at this stage whether the authorization Plaintiff granted to BNY Mellon extends to BNY Mellon's use of Moksha after March 2, 2021.[19]  The cases cited by BNY Mellon in support were at the summary judgment stage, or the preliminary injunction stage following an evidentiary hearing, further demonstrating that this inquiry is ill-suited for the 12(b)(6) stage.  D.E. 99-1 at 15-16.  At this point, it is sufficient that Plaintiff has plausibly alleged a revocation of the authorization it had previously granted.  SAC ¶ 100.  BNY Mellon has not made any further arguments in favor of dismissal and Count Eleven survives insofar as it alleges copyright infringement after Plaintiff purportedly revoked BNY Mellon's authorization to use Moksha.

---

[19] In its Prior Opinion, the Court noted that BNY Mellon had not "definitively shown[n] that Q2 or Data Blue acquired rights in Moksha sufficient to allow the transfer of the copyright to BNY Mellon by virtue of the MSA or CSA."  Prior Opinion at 16.  In its present motion, BNY Mellon does not argue that it owns Moksha pursuant to the MSA or CSA.  Thus, the clauses in those agreements that purport to transfer ownership of certain property to BNY Mellon do not warrant dismissal of this claim at this time.  The Court also notes that in its opposition to Ahead's motion, Plaintiff writes "[n]o party disputes that *Data Blue, now AHEAD, owned Plaintiff's software and IP at the time they transferred it to BNY Mellon* by installing it on the BNY Mellon computers."  D.E. 122 at 13 (emphasis added).  The very next sentence is directly opposite, and states "[t]he allegations in Plaintiff's SAC are that Data Blue, *which did not own Plaintiff's software and IP or have the right to sell it*, sold it to BNY Mellon, and that Plaintiff was thereby injured."  *Id.* (emphasis added).  The Court recognizes that if the first quote is true and Plaintiff is not disputing that Data Blue owned Moksha and rightfully transferred it to BNY Mellon, then it would significantly undermine, if not entirely defeat, all of Plaintiff's claims.  Given the second quote, however, and Plaintiff's arguments that the transfer was wrongful or inoperative, the Court views the first quote as an inadvertent misstatement.  Nevertheless, the first quote is indicative of Plaintiff's muddled pleading and legal theories.

**L.  Contributory Copyright Infringement, 17 U.S.C. § 101 *et seq*., as to Q2 and Ahead**

In its Prior Opinion, the Court dismissed Plaintiff's copyright infringement claim against Ahead and Q2 because Plaintiff failed to "sufficiently allege[] that Ahead or Q2 violated any of Plaintiff's rights under the Copyright Act."  Prior Opinion at 14.  Plaintiff instead "only alleged their 'inaction,' 'tacit approval' and 'failure to object' to *BNY Mellon's* alleged infringement, which is insufficient to state a claim against [Ahead and Q2]."  *Id.* at 13 (emphasis in original).  In the SAC, Plaintiff recasts its claim against Ahead and Q2 as claims for contributory copyright infringement and vicarious copyright infringement.

"While the Copyright Act does not expressly make anyone liable for the copyright infringement of another, the law establishes doctrines of secondary liability."  *Parker v. Google, Inc.*, 242 F. App'x 833, 837 (3d Cir. 2007) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30 (2005)).  "To allege a claim of contributory copyright infringement, a plaintiff must allege: (1) direct copyright infringement of a third-party; (2) knowledge by the defendant that the third-party was directly infringing; and (3) material contribution to the infringement."  *Id.* (citing *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 160 (3d Cir. 1984)).

Both Ahead and Q2 argue that, even assuming BNY Mellon committed copyright infringement, there are no plausible allegations that they had knowledge of the infringement or that they materially contributed to the infringement.  The Court agrees.  Plaintiff has not plausibly alleged that Ahead/Data Blue or Q2 were ever aware that Plaintiff provided Moksha to BNY Mellon, that BNY Mellon locked Plaintiff out of Moksha, or even that Moksha existed.  Thus, Plaintiff has failed to plead that Ahead or Q2 had knowledge of BNY Mellon's purported infringement, assuming such infringement existed.

Plaintiff's claim also fails because it has not alleged any material contribution by Ahead or Q2. Shankar states that he made a presentation, on his own accord, to Mark Szpakowski and BNY Mellon about Moksha; installed Moksha on several BNY Mellon computers; and that BNY Mellon employees deployed Moksha to 95,000 BNY Mellon computers. Shankar Decl. ¶¶ 6, 7, 11i. No involvement from Ahead or Q2 is alleged. Further, no conduct is alleged as to Ahead or Q2 after Plaintiff was "locked out" of Moksha. The SAC merely alleges in conclusory fashion that Ahead and Q2 "knowingly caused and materially contributed to" the infringement, and that they "facilitated [and] encouraged" the infringement. Thus, Count Twelve is dismissed.

Plaintiff attempts to save its claim by reference to facts which were not alleged and/or are directly contradicted by the facts in the SAC or Shankar Declaration. For instance, as to Data Blue/Ahead, Plaintiff claims that (1) "[t]here are abundant fact allegations concerning the negotiation between Plaintiff and AHEAD to get defendants to pay a licensing fee," (2) "[t]here are abundant factual allegations that AHEAD installed the software on BNY Mellon's computers," and (3) "Data Blue made a material contribution to the infringement by installing Plaintiff's software and IP on BNY Mellon's computers without a license." D.E. 122 at 17. The SAC and Shankar Declaration, however, do not support these arguments. In fact, the Shankar Declaration explicitly states that either Shankar or BNY Mellon employees installed the software. Shankar Decl. ¶¶ 6-7, 9, 11i.

As to Q2, Plaintiff argues that "there are abundant factual allegations concerning the negotiation and contract between [BNY Mellon] and Q2 to show Q2 was aware that [BNY Mellon] intended to take Plaintiff's copyright for itself." D.E. 126 at 24. Plaintiff cites nothing in support of this statement and the Court sees no support for it in the SAC or the Shankar Declaration. And despite Plaintiff's protestations to the contrary, *id.*, there are no allegations that Q2 was aware

Moksha existed, and Plaintiff had already provided Moksha to BNY Mellon *before* Plaintiff began working with Q2.   Moreover, the CSA does not call for Plaintiff to install Moksha on BNY Mellon's computers—Shankar claims that he presented this as an option to BNY Mellon on his own accord.   Shankar Decl. ¶ 6; SAC ¶ 61 ("Neither the MSA nor the CSA was signed by or mentions iPurusa, Shankar Rampersaud, or M. Casey Rampersaud.   The MSA and CSA likewise do not explicitly mention the Moksha software.").

### M. Vicarious Copyright Infringement, 17 U.S.C. § 101 *et seq.*, as to Q2 and Ahead

Count Thirteen alleges vicarious copyright infringement as to Ahead and Q2.   To state such a claim, a plaintiff must allege that "the defendant 'has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities.'"   *Parker*, 242 F. App'x at 837 (citing *Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).   This claim also fails as to both Ahead and Q2.   First, the SAC and Shankar Declaration contain no allegations that Ahead or Q2 had any "right and ability to supervise the infringing activity."   Plaintiff claims that Ahead had such right and ability because "Data Blue (AHEAD) ordered the installation of the software on BNY Mellon computers."   D.E. 122 at 18.   There are no allegations that Data Blue/Ahead ordered the installation of Moksha and the MSA does not call for such installation.   Again, Shankar apparently made the decision to present Moksha to BNY Mellon as an option for its automation needs on his own.   Shankar Decl. ¶ 6.

Plaintiff claims that Q2 had a right and ability to supervise the infringing activity because "the SAC adequately alleges that Q2 contracted for the installation of Plaintiff's software on [BNY Mellon] computers."   D.E. 126 at 25.   Again, no allegations support this statement.   Plaintiff gave Moksha to BNY Mellon before Q2 and BNY Mellon entered into the CSA and before Plaintiff began its relationship with Q2.   *See* Shankar Decl. ¶¶ 7, 9.   Moreover, the Shankar Declaration

makes clear that Shankar voluntarily began the process of providing Moksha to BNY Mellon without any prompting from Q2 (or any other party) and that he continued to acquiesce by extending the license key. *Id.* ¶¶ 6, 18. The CSA also does not mention Moksha or iPurusa. SAC ¶ 61. Plaintiff has thus failed to plausibly allege that Data Blue/Ahead or Q2 has the right or ability to supervise BNY Mellon's allegedly infringing activity.

Plaintiff has also failed to allege that Ahead or Q2 had any financial interest in the infringing activity. Plaintiff argues that Data Blue/Ahead were paid pursuant to the MSA, D.E. 122 at 18, and that "Q2 profited as it was compensated financially by [BNY Mellon], D.E. 126 at 25. But the only payments alleged as to these two entities is for the engineering services provided by Shankar/iPurusa under the MSA and CSA. Ahead and Q2 are not alleged to have had a financial interest in any purported copyright infringement. *See Parker*, 242 F. App'x at 837 (affirming the district court's dismissal of plaintiff's vicarious copyright infringement claim where the complaint "failed to allege that [defendant] had a direct financial interest in the purported infringing activity"). Thus, Count Thirteen is dismissed.

## IV.   CONCLUSION

For the reasons stated herein, Defendant Ahead's motion to dismiss the Amended Complaint, D.E. 97, is **GRANTED**; Defendant BNY Mellon's motion to dismiss, D.E. 99, is **GRANTED in part** and **DENIED in part**; and Defendant Q2's motion to dismiss, D.E. 112, is **GRANTED in part** and **DENIED in part**.  Counts Two and Eleven survive as to BNY Mellon and Count Eight survives as to Q2 to the limited extents stated in this Opinion.  The SAC is otherwise dismissed without prejudice.  Plaintiff may file an amended complaint that cures the identified deficiencies within thirty (30) days.[20]  If Plaintiff does not file an amended complaint within this time, those counts dismissed herein will be dismissed with prejudice.  An appropriate Order accompanies this Opinion.

Dated: April 25, 2023

John Michael Vazquez, U.S.D.J.

---

[20] The Court notes that while a plaintiff is typically free to file an amended pleading that is inconsistent with the superseded pleading, *see West Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165 (3d Cir. 2013), Plaintiff here has largely relied on the Shankar Declaration for its factual allegations.  The Shankar Declaration, unlike a typical complaint, states that it was signed under penalty of perjury.  D.E. 100-1.  Given this posture, the Court will hesitate to accept further pleadings that are inconsistent with Shankar Rampersaud's sworn statements without sufficient explanation as to any discrepancies.  *See id.* at 173 n. 4 (noting that where a complaint is verified under penalty of perjury by a manager of the plaintiff entity, such verification "places a heavy burden" on plaintiff to explain later discrepancies).